.[Crim. No. 3223. First Dist., Div. Two. Feb. 1, 1957.]

THE PEOPLE, Respondent, v. WAYNE LANCASTER
et al., Appellants.

Joseph L. Bortin, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

THE COURT.—Lancaster and McNorwood were accused by an information of robbery in that on August 20, 1955, they robbed Tom Montoya of one hundred dollars more or less. They stood mute on arraignment and the court ordered a plea of not guilty entered. They each admitted later a prior conviction alleged in the information, to wit: Lancaster for a second degree robbery committed in Los Angeles in 1947 and McNorwood for a petty theft committed in 1954 in Alameda County. They were by a jury found guilty as charged, the degree of robbery was fixed at first degree, their motion for a new trial was denied and they were sentenced to San Quentin. They appeal from the judgments and the order denying their motion for a new trial.

Montoya testified in part as follows:

On Friday, August 19, 1955, he finished work at the Pacific Can Company at midnight and with his pay in his wallet first had some Mexican food in a café on 83rd Street in Oakland and then with two acquaintances drove to Singer's

Café on 7th Street in West Oakland in the car of one of the two, Martinez. They did not arrive at Singer's Café until 2 a. m. of August 20th. After the three men had ordered coffee defendant Lancaster offered to sell Montoya half a pint of whiskey. Montoya bought it and paid for it outside and went back to the table where he sat with his acquaintances. After some twenty minutes defendant McNorwood came to the table and offered to sell Montoya a half pint of whiskey. Montoya had not known either of the defendants before. He went outside with McNorwood to get the half pint. McNorwood took him around the corner to a car lot in back of Singer's place and told him to wait. In a few minutes McNorwood came back and said that he had gotten another half and asked whether Montoya wanted to buy that too. Montoya agreed to buy it if McNorwood got it. McNorwood went to a car, came back to Montoya, held a knife to his stomach and said this is a stickup. Montoya tried to prevent him from cutting him, but was struck on the side of the head by another man of whom he had only a very quick glance, but of which he had a pretty sure impression that it was the man who sold him the first half pint, defendant Lancaster. He could, however, not positively swear to it. Montoya fell down. He saw McNorwood take his wallet. He passed out. When he came to he was bleeding and wounded and his money, his $116 pay and more, was gone. After the police had been warned he went home by taxi and from there the police took him to a hospital where he received seven stitches. He did not see the defendants again until the preliminary hearing of their case before the magistrate on October 18, 1955. He did not see them in any line-up and it does not appear that he identified them in any way prior to the preliminary hearing. He testified that he could not tell whether Lancaster had a mustache, because he looked as if he hadn't shaved for quite some time. He testified that McNorwood had no mustache. There was other evidence that both had mustaches, including testimony to that effect by Police Inspector Zweigle, who arrested Lancaster on August 20, 1955, and McNorwood on August 21, 1955, for another offense committed by them in the early hours of August 19, 1955 (as to which evidence was admitted in this case as a similar offense). There were several minor conflicts in the testimony of Montoya, both in different parts of his testimony at the trial itself, and as compared to his testimony at the preliminary hearing. They relate to details of the road fol-

lowed in going to Singer's, the price which was asked for the half pints of whiskey and which he paid for the first one, and the number of times McNorwood went to a car before threatening him with a knife. He was not sure of the name of the third man who went with him to John Singer's and called him Cavelli (the name of the man who was heard as a rebuttal witness for the People was Esquibel). He was an inaccurate and confused witness, partly because he proved not to know what was the left and what the right.

After a hearing in chambers the trial judge permitted the proof of a similar offense committed by defendants in the early morning hours of the 19th (24 hours before the offense now before us), over objection of defendants, based on a dissimilarity in that in the prior case they pretended to procure a woman for the victim and in this case whiskey. The testimony of Joe DeAguero, the victim of the similar offense, was in substance as follows:

On August 19, 1955, at approximately 3 a. m., he was sitting alone in his car parked outside John Singer's. McNorwood came up to the car and asked him if he was looking for a woman. When DeAguero said yes, McNorwood told him that he would take him to the place where he would get some. After having gone into John Singer's to make a telephone call, he told DeAguero that everything was fixed, got into the car and directed DeAguero to an apartment house on Campbell Street. Inside he brought DeAguero to a washroom on the second floor where Lancaster came to them. Lancaster said that he would go and see if any woman was available. When he came back he said they would be ready in a little while; the price would be $10 and he asked to have it. When DeAguero had pulled a ten dollar bill from his wallet. Lancaster asked to see it because he thought it was phoney. DeAguero refused but Lancaster grabbed the bill and the wallet. In the struggle for the wallet it was torn. Lancaster said he was going to check it. He went downstairs and came back with the wallet. DeAguero's papers were in it but when he asked for his money, Lancaster pulled a knife and held it against DeAguero's side. He left giving the knife to McNorwood who then held it against DeAguero but soon also left, closing the door on DeAguero. The evidence further shows that when defendants were arrested for said offense they first denied any connection with it, but afterwards pleaded guilty to petty theft, Lancaster being sentenced to 120 days in jail, McNorwood obtaining probation.

Both Lancaster and McNorwood testified in their defense and denied any knowledge of the robbery committed on Montoya and their presence near John Singer's restaurant in the night from Friday, August 19th to Saturday, August 20, 1955. They admitted that they took DeAguero's money but testified that they did it without any violence in a confidence game. In the apartment house where McNorwood brought DeAguero, Lancaster, in accordance with a plan quickly agreed upon and known to both, played the manager, took the $10 for the girl and took the rest of his money under the pretext of checking it with the landlady for protection, contendedly with full agreement of DeAguero. The use of a knife and all use of force they denied. They split the $90 they obtained from him. Later in the night they both went to McNorwood's room in the American Hotel, where they stayed until about 2 p. m. of said Friday, August 19th.

McNorwood gave the following story of his further activities. With his share of the loot he redeemed his jacket from one pawn shop and his trousers from another. He returned to the hotel, put on those clothes, went out for a haircut, back for a shower and shave, left his old clothes with a cleaner, at John Singer's met a girl that worked there, and at 8 :20 p. m. of the 19th took a bus intending to go to his mother's home. On another bus to which he transferred for that purpose he met Mrs. Minnie Seamore. McNorwood and his mother, Idonie McNorwood, both testified that he arrived at his mother's apartment on 36th Street at or before 9 p. m. When he heard that his sister who had lived there had moved, he asked to stay there overnight. They talked until midnight, then McNorwood went to bed in the bedroom next to his mother's and did not leave until 8 :30 or 9 a. m. Saturday morning, August 20th. The mother testified that she could not sleep at midnight but walked the floor and sometimes went into the room where her son was asleep to look out of the window. She did not go to bed until 3 :30 or 4. Both testified that the next morning she prepared his breakfast and gave him 40 or 50 cents to go to San Francisco to register at the Union to try to get on a boat. She also introduced him to Eddie Simmons who lived in the apartment opposite hers. McNorwood further testified that the $45 of DeAguero had been spent. He pawned his jacket again and as it was too late to register went instead to the Broadway Theater where he watched a picture, "The Silver Chalice," sitting through it twice. To the police he had said that he

did not go to San Francisco because the money his mother gave him was insufficient. Eddie Simmons corroborated having met McNorwood that Saturday morning between eight and ten. Minnie Seamore remembered having met McNorwood on the streetcar line in question when coming from her work. She knew that it was in the latter part of August before the 20th on which she left for Los Angeles, but she did not know whether it was on the 19th or the 17th or 18th.

Lancaster testified that when he left McNorwood at the American Hotel on the 19th at 2 p.m. he went to a bar where he stayed until dark, then went home, took a shower and fell asleep on his bed. He was still home when he was arrested the next morning at 10 a.m.

In rebuttal Jose Esquibel testified that he was in John Singer's bar with Montoya and Martinez. He was with them part of the time. He saw McNorwood walking around there. He didn't see him come to the table. He told Montoya that the price asked for the whiskey was too high. He does not remember having seen Lancaster there. The manager of the Broadway Theater, in which McNorwood said he had seen "The Silver Chalice" twice on August 20th, testified that that picture did not play there at that time, but had played there on August 7th and 8th.

The appeal is not based on insufficiency of the evidence as it is conceded that the identification of the defendants at the trial was sufficient to sustain the verdict. It is, however, urged that the uncertainty of the testimony of Montoya and the suggestive fact that he saw the defendants at the preliminary hearing before having identified them are grounds for considering all errors pointed out by appellants as prejudicial and resulting in the conviction.

It is primarily urged that it was error to admit the evidence of the "similar" offense of the preceding night, which according to appellants was not similar but a confidence game without violence, a circumstance allegedly confirmed by their convictions of petty theft for that offense. ▇ We do not agree. Although as a general rule evidence of collateral independent crimes is not admissible in a criminal prosecution, there are well recognized exceptions permitting the admission of evidence of other crimes, e.g., where it helps to disclose a common plan or scheme. ▇ Extreme caution should be used not to admit evidence which might prejudice the minds of the jurors, without carrying with it proper evidence of the particular

guilt. (*People* v. *Albertson,* 23 Cal.2d 550, 576-577 [145 P.2d 7].) ■ But when the proof of one crime tends logically, naturally and by reasonable inference to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion. (*People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].) ■ In this case evidence that defendants the night before near the same café lured another man to a secluded place under the pretext of doing something for him, and there took his money from him, using a knife to restrain him, tends to show a common scheme or plan according to which defendants operated. ■ Their denial of the use of a knife, or of force in general, explicitly testified to by DeAguero can cause a conflict in the evidence but cannot affect its admissibility. The same applies to the conviction of *petty theft only.* Defendants often by agreement with the prosecution plead guilty to a minor offense rather than a greater of which they could be accused. The conviction of the lesser offense at most goes to the weight of the evidence and not to its admissibility. ■ Even the fact that the defendant has been acquitted of the previous charge does not require exclusion of evidence regarding it for the purpose of showing common plan or design, "although the force of the evidence may be thereby weakened." (*People* v. *Fox,* 126 Cal.App.2d 560, 569 [272 P.2d 832].) ■ The evidence showing prior cooperation of Lancaster and McNorwood in crime tends also to strengthen the uncertain identification of Lancaster as the man who struck Montoya and was therefore material and admissible. (See *People* v. *Ferdinand,* 194 Cal. 555, 561 [229 P. 341].)

■ Appellants also complain of the allegedly too extensive use made by the prosecutor in his argument to the jury of the evidence as to the similar offense to attack the character of the defendants and their credibility, which alleged use they designate as misconduct on appeal. No assignment of misconduct in this respect was made in the court below. Appellants testified in their own behalf that the taking of the money from DeAguero was a "con game." It does not seem improper for the prosecution to point out that con men are not the most credible witnesses. ■ Less correct seems the prosecutor's statement regarding Lancaster: "He tells you he has held up Mr. DeAguero," which might mean that Lancaster had admitted robbing DeAguero, whereas he had expressly denied the use of force. However, with respect to the offense against

DeAguero the distinction between a confidence game and a robbery had been treated before the jury so explicitly that no prejudice can have resulted from this mistake.

 It is contended that the prosecutor deliberately misstated the evidence in his closing argument when after glossing over the fact that there had been no lineup, he started to assert that the police had used pictures. When the public defender interrupted that there had been no testimony of pictures, the prosecutor apologized and said that the judge would instruct to disregard. Thereafter the defense did not move for an admonition and the court did not give any, obviously thinking that such was unnecessary after the apology of the prosecutor. The discussion can only have aided the defense by calling further attention to the little safeguard provided in this case for a correct identification, and there seems hardly any probability that the prosecutor acted deliberately. The mistake is no ground for reversal.

Appellants' contention that the prosecutor improperly injected his own opinion about the identity of the defendants as the robbers into his argument is based on the omission of several sentences spoken by the prosecutor between his statement that the identity was the question to decide and his later statement ". . . Frankly, to my mind, there is no question." The omitted sentences related to the question of defendants having mustaches, without Montoya knowing it. His statement that there is no question may well have related to the following part of a sentence which preceded it "but I ask you if you were down at John Singer's in the middle of the night, and as he testified, one of them was heavily whiskered, would you know whether one of them had a mustache or not?" Understandably, there was no assignment of misconduct or request for admonition. We find no reversible misconduct.

Appellants next predicate error on two rulings sustaining objections to questions by their own counsel. An objection as incompetent, irrelevant and immaterial was sustained, when after DeAguero under cross-examination had testified that he had preferred charges against defendants, their counsel asked: "Did you charge them with robbery?" When the objection was made counsel did not explain in any way the relevancy or materiality of the question under what exact name the victim of the similar offense preferred charges. On appeal the relevancy and materiality is explained on the ground that a negative answer would tend to confirm the position of defend-

ants that no force had been used against DeAguero. However, said ground was then not evident without explanation, because it was not known yet that defendants would testify that although they took DeAguero's money they did it in a confidence game without use of force. (There had been no opening statement for the defense and at the hearing in chambers concerning the similar offense there had been no denial of use of force.) We hold that in the absence of such explanation which was available to defendants, but not to the court, appellants cannot urge this ground for the first time on appeal. (*Estate of Carpenter,* 127 Cal. 582, 586 [60 P. 162]; *Estate of Parkinson,* 190 Cal. 475, 477 [213 P. 259]; *Hession* v. *City & County of San Francisco,* 122 Cal.App.2d 592, 605 [265 P.2d 542].) We are aware of the rule that no offer of proof is necessary in order to obtain a review of rulings on cross-examination, because questions on cross-examination are largely exploratory (*Tossman* v. *Newman,* 37 Cal.2d 522, 525 [233 P.2d 1]). However, here the question was not exploratory but served a purpose known to the defense but not explained to the court. The matter of relevancy must be left largely to the discretion of the trial court. (*Estate of Carpenter, supra; People* v. *Craig,* 111 Cal. 460, 466 [44 P. 186].)

█ If considering the data available to the trial court its exclusion of a question as irrelevant or immaterial is not an abuse of discretion, the appellant cannot for the first time on appeal attack the discretion on grounds which he could have proffered in the trial court but did not disclose. A contrary rule would enable a party secretly to reserve a means of reversal in case the judgment went against him.

█ During the direct examination of McNorwood's mother as a witness for the defense objection on the ground of hearsay was sustained to testimony concerning what her son told her when he came to her home about whom he came down with and in discussing people. The admissibility was defended on the ground that the conversation was not offered for the truth of what defendant said but to show what topics were discussed. Evidently, what topics were discussed in general has no relevancy or materiality for defendant's case (proof of alibi). The only possible purpose of the testimony was to corroborate McNorwood's testimony that on the bus he had traveled with Mrs. Minnie Seamore. Used for that purpose the testimony was hearsay concerning self-serving statements of defendant McNorwood and as such was correctly excluded. (*People* v. *Kalkman,* 72 Cal. 212, 215 [13

P. 500] ; *People* v. *Rodley,* 131 Cal. 240, 255 [63 P. 351].)
This is not a case where the making of the statement alone
is material irrespective of its truth.

Finally, appellants designate errors in instructions. It is
said that an instruction that a statement made by a de-
fendant outside of the trial may be an admission and which
further defines an admission constitutes error, because there
was no evidence of any extrajudicial statement of either
defendant in the record which could be considered an ad-
mission. This may well be so. "But an instruction, erro-
neous or correct, which relates to matters as to which there is
no evidence will not justify a reversal unless it has misled the
jury to the prejudice of the appellant." (*Mehollin* v. *Ysuchi-
yama,* 11 Cal.2d 53, 57 [77 P.2d 855] ; and see *Nelson* v.
*Porterville U. H. School Dist.,* 117 Cal.App.2d 96, 99 [254
P.2d 945].)

Appellants do not point out any manner in which this
instruction, even if there was no evidence to which it was
applicable, could have misled the jury and after considering
all the evidence we see no such possibility.

Appellants complain of a general instruction on circum-
stantial evidence defining presumptions and inferences, taken
literally from CALJIC Number 25, contending that no cir-
cumstantial evidence was involved in the case. The contention
is wholly without merit. The presumption of innocence is
involved in every criminal case and alibi and similar offenses
are matters of inferential evidence.

 The last two instructions complained of seem harmless.
The first of the two, CALJIC Number 23, is to the effect
that neither the prosecution nor the defense is required to
produce all persons who might have some knowledge of
matters involved in the case or all objects or documents
referred to. The second reads "You have no right to specu-
late as to what any witness . . . any person not called as
a witness might testify to if called. . . ." It is contended
that said instructions erroneously prevented the jury from
considering the conspicuous absence of vital corroborative
evidence, such as the knife referred to as used in the robberies.
The instruction CALJIC Number 23 was held harmless in
*People* v. *Powell,* 83 Cal.App. 62, 67-68 [256 P. 561], although
it is said that it might well be omitted unless required by
the circumstances of the case. It seems intended to prevent
false inferences like the one proposed by appellants, that
the fact that no knife was produced caused a conflict with

the express testimony of the victims as to the use of a knife, although the defendants were not apprehended at the time or the place of either of the offenses. The second above instruction logically follows from the first and is in line with the general prohibition of mere speculation by a jury. The only person known to have been present but not produced as a witness was Montoya's acquaintance Martinez. There is no basis for any inference as to the reason for his absence or the contents of his testimony if he had been produced. There is no error or prejudice in excluding speculation in that respect.

There being no reversible error the judgment and order must be affirmed.

Judgment and order affirmed.

Appellants' petition for a hearing by the Supreme Court was denied March 27, 1957.