[Crim. No. 10308. In Bank. Apr. 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD DEAN GRIFFIN, Defendant and Appellant.

460

Erling J. Hovden, Public Defender, Charles A. Maple and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant was sentenced to death for the murder of Essie Mae Hodson. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

There have been three trials. In the first, defendant was found guilty of first degree murder and sentenced to death. On automatic appeal we affirmed the judgment. (*People* v. *Griffin,* 60 Cal.2d 182 [32 Cal.Rptr. 24, 383 P.2d 432].) The United States Supreme Court reversed on the ground that the prosecutor's comments and the trial court's instructions to the jury concerning defendant's failure to take the stand and testify violated the self-incrimination clause of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment in *Malloy* v. *Hogan,* 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489]. (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].)

In the second trial the jury was discharged and a mistrial declared when the jury failed to reach a verdict. Based on this fact, defendant moved to enter a plea of once in jeopardy to the charge of first degree murder. The motion was denied, the case proceeded to the third trial, and the jury found defendant guilty of first degree murder and fixed the punishment at death.

The evidence disclosed the following events.

On December 2, 1961, Eddie Seay and a friend he knew as Al met defendant on a Los Angeles sidewalk. Defendant asked them for directions to the 41st Street Club, a beer and wine bar in the neighborhood. He also asked the two men where they were going and, learning that they were on their way to buy a bottle of wine, gave them a quarter toward the price. The group then parted, defendant presumably heading for the 41st Street Club.

Seay and Al bought and drank the wine and about 9 p.m. entered the 41st Street Club. Essie Mae Hodson, who had been living with Seay for about three years, was sitting at a booth with two friends. Seay and Al joined the group at the booth, and defendant, who had been standing at the bar, also joined them at Seay's invitation. They talked and drank wine and beer purchased by defendant. During the evening Al and Essie Mae's friends left the booth, and between midnight and 1 a.m. Essie May went home to bed. Defendant and Seay

stayed at the bar drinking coffee until about 2 a.m. Because it was late, defendant asked Seay if he could spend the night in the apartment shared by Seay and Essie May. Seay agreed, and the two men left the bar together.

Seay and Essie Mae lived in an upstairs apartment of a four-unit building. Essie Mae was asleep in the bedroom when Seay and defendant arrived. Seay prepared a daybed in the living room for defendant and then went to bed with Essie Mae. He was awakened later by a noise in the living room. He got out of bed and saw defendant and Essie Mae struggling on the daybed. Essie Mae told Seay that defendant had put his hand over her mouth and tried to force her to have sexual relations with him. Seay suggested to defendant that they go out for coffee and took him down the back stairs. At the bottom of the stairs Seay told defendant to wait for a minute. He then left defendant, returned to the apartment by another stairway, and went back to bed with Essie Mae.

A few minutes later Seay heard knocking at the back door and defendant calling to be let in. He then heard glass breaking, got out of bed, put on his pants, and went back toward the door. He found defendant standing in the living room. Again Seay suggested that they go out for coffee, and again the two men went down the back stairs. Defendant at the time was making "moaning" sounds and kept repeating that he wanted to return to the apartment. When they reached the bottom of the stairs, defendant hit Seay twice, knocking him to the ground. Seay got up and ran to the 41st Street Club for help. There he found a man called Piggy-bank who agreed to return to the apartment with him. When they arrived defendant and Essie Mae were gone. Seay never saw her alive again.

About 7 on the morning of December 3 Alfredo Villasenor went to an alley about 300 feet from Essie Mae's apartment to look for scrap wood. In the alley was a very large trash box used for sawdust and scrap. Villasenor saw defendant coming out of the box buttoning up his pants and asked him what he was doing. Defendant replied, "Nothing," and walked away. Villasenor looked into the trash box and saw Essie Mae. She was trembling and appeared to have been beaten.

The police were called. When they arrived, the officers found Essie Mae seated at the front of the trash box. She was dressed only in a long robe that was wet and dirty. She was shivering, bleeding from the head, had scratches on the backs of her hands, and appeared to be in shock. Her responses to

questions were largely incoherent, and the police were able to learn nothing more than her name. The trash box was blood-stained; in the box was the wig that Essie Mae always wore.

Essie Mae was taken to a hospital where she died the next day. An autopsy revealed two large abrasions on her head, indicating that she either had been struck with or had fallen against a solid object at least twice. There were multiple abrasions and scratches on her face, chest, ankles, and on the backs of her hands. There were no bruises, tears, or other indications of forcible rape in the vicinity of the thighs or external genitalia, nor was there evidence of sperm. According to the pathologist who performed the autopsy, however, there would normally be no sperm present 24 or at most 48 hours after intercourse. The pathologist further testified that, judging from the nature of her injuries, it was unlikely that Essie Mae would have voluntarily participated in sexual intercourse or that she would have been able to resist sexual attack. Further, he felt that with her injuries she probably would have been unable to walk the 300 feet from the apartment stairway to the trash box without assistance.

After the attack on Essie Mae, defendant went to Mexicali, Mexico. There, in mid-December, he met Willie Kerr, who was living with Amanda Encinas. Kerr knew defendant as Willie Lee Fairchild. Defendant obtained work at a cotton mill in El Centro, California, where Kerr also worked. Kerr agreed to allow defendant to stay at his home in Mexicali.

On December 16, before Kerr went to work, he told Amanda that defendant would be coming to stay with them and instructed her to make defendant's breakfast when he came. When defendant arrived, he motioned to Amanda, who spoke only Spanish, that he wanted a towel. She testified that when she took the towel to defendant, he grabbed her, pushed her out of the kitchen and into another room, began to beat her, forced her to disrobe, threw her on the bed, and attempted to have intercourse with her. Amanda testified through an interpreter that during the attempt defendant said he would kill her in five minutes. Kerr returned home from work about noon. He found Amanda in her slip and defendant in the process of putting on his trousers. Kerr pushed Amanda and threatened defendant. The police, who had probably been called by neighbors, arrived and took Amanda, Kerr, and defendant to jail. Defendant was charged with rape, tried, and acquitted. He was subsequently arrested in Mexicali for the murder of Essie Mae.

 We first consider defendant's contention that his third trial placed him twice in jeopardy of first degree murder. (Cal. Const., art. I, § 13; Pen. Code, § 1023.) The jury at the second trial was discharged after failing to reach a unanimous verdict, and a mistrial was declared. (Pen. Code, §§ 1140, 1141.) After the jury was discharged, the foreman disclosed in open court that the jurors had stood 10 for acquittal and 2 for guilty of second degree murder. The trial court refused to make this information a matter of record, but the prosecution and defendant stipulated to the fact before the beginning of the third trial. Defendant contends that this fact establishes an implied acquittal of first degree murder.

This contention must be rejected. Defendant does not deny that the jury was properly discharged pursuant to Penal Code section 1140. (Compare *Paulson* v. *Superior Court,* 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641].) We may not infer from the foreman's statement that the jury had unanimously agreed to acquit of first degree murder. There is no reliable basis in fact for such an implication, for the jurors had not completed their deliberations and those voting for second degree murder may have been temporarily compromising in an effort to reach unanimity. Nor need we "imply" an acquittal as a matter of policy. Defendant has not had a conviction of a lesser offense overturned on appeal, and it is therefore not necessary to prohibit retrial for any greater crime to protect the right to appeal. (Compare *Green* v. *United States,* 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119] ; *Gomez* v. *Superior Court,* 50 Cal.2d 640 [328 P.2d 976] ; *People* v. *Henderson,* 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677].)

Defendant contends that the trial court erred in admitting the evidence of the subsequent attack on Amanda in Mexico, on the ground that he was acquitted of that crime. It is settled, however, that competent and otherwise admissible evidence of another crime is not made inadmissible by reason of the defendant's acquittal of that crime. (*People* v. *Griffin,* 60 Cal.2d 182, 191 [32 Cal.Rptr. 24, 383 P.2d 432] ; *People* v. *Frank,* 28 Cal. 507; *People* v. *Fox,* 126 Cal.App.2d 560 [272 P.2d 832] ; *People* v. *Lewis,* 105 Cal.App.2d 208 [233 P.2d 30] ; *People* v. *Follette,* 74 Cal.App. 178 [240 P. 502] ; Note, 86 A.L.R.2d 1132; see McBaine, Cal. Evidence Manual (2d ed. 1960) § 637, p. 220.)

 In the present case the evidence of the subsequent crime was admissible because the similarities between the

crimes made evidence of the later crime relevant to prove that Essie Mae's injuries were not accidental but inflicted by defendant and to prove that he intended to rape her. The evidence tended to prove that in both instances defendant became acquainted with a man living with a common law wife, used that acquaintance to be invited to the man's home for the night or longer, and then attacked the woman in the man's absence. Under these circumstances, the evidence of the other crime is relevant even though it occurred after instead of before the crime charged, and the chronology of the crimes does not therefore affect the admissibility of the evidence of the subsequent crime. (*People* v. *Coefield*, 37 Cal.2d 865, 870 [236 P.2d 570] ; *People* v. *Ferdinand*, 194 Cal. 555, 561 [229 P. 341].)

The trial court erred, however, in excluding evidence on the issue of guilt that defendant was acquitted of the subsequent crime by a Mexican court. Although there is authority to the contrary (Note, 86 A.L.R.2d 1132, 1135, 1145-46), the better rule allows proof of an acquittal to weaken and rebut the prosecution's evidence of the other crime. (*People* v. *Frank*, 28 Cal. 507, 515; *People* v. *Lancaster*, 148 Cal.App.2d 187, 194 [306 P.2d 626] ; *People* v. *Fox*, 126 Cal.App.2d 560, 569 [272 P.2d 832] ; *People* v. *Follette*, 74 Cal.App. 178, 212 [240 P. 502] ; *Pilcher* v. *United States* (5th Cir. 1902) 113 F. 248, 249 [51 C.C.A. 205] ; Note, 86 A.L.R.2d 1132, 1144-45.)

The Attorney General contends that evidence of acquittal of another crime should not be admissible to prove that a defendant was not guilty of that crime, on the ground that the acquittal is only the hearsay opinion of another factfinder based on evidence presented at another time and place. The same objection could be made to the use of many other official records as admissible hearsay, and, accordingly, it would be anomalous to treat judgments differently from other properly authenticated official documents when they are offered, not as res judicata, but for their evidentiary value alone. (See McCormick, Evidence (1954) § 295, pp. 618-19; 5 Wigmore, Evidence (3d ed. 1940) § 1671a, pp. 688-89.)[1] ██ Whatever merit there may be to denying judgments evidentiary

---

[1]Wigmore has suggested that the exclusion of judgments under many circumstances has been due to a failure to distinguish between treating them as conclusive proof of facts stated and treating them merely as admissible evidence of those facts, subject to rebuttal. (See 5 Wigmore, Evidence (3d ed. 1940) § 1671a, p. 688. See also *id.* at p. 694; 4 Wigmore, Evidence (3d ed. 1940) § 1346a, p. 671.)

value in other contexts,[2] we are convinced that we should not depart from the rule that a properly authenticated acquittal is admissible to rebut prosecution evidence of guilt of another crime.

■ Regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice, and it is therefore always "to be received with 'extreme caution.'" (*People* v. *Albertson*, 23 Cal.2d 550, 577 [145 P.2d 7].) Indeed, for this very reason some courts have concluded that an acquittal so attenuates the weight that may properly be given evidence of another crime as to require the exclusion of such evidence altogether. (See *People* v. *Ulrich*, 30 Ill.2d 94, 101 [195 N.E.2d 180]; *State* v. *Little*, 87 Ariz. 295, 307 [350 P.2d 756, 86 A.L.R.2d 1120].) Our rule does not go that far, but instead is fair to both the prosecution and the defense by assisting the jury in its assessment of the significance of the evidence of another crime with the knowledge that at another time and place a duly constituted tribunal charged with the very issue of determining defendant's guilt or innocence of the other crime concluded that he was not guilty.[3]

■ The error in excluding the evidence of the Mexican acquittal was prejudicial. The admission of the evidence of the Mexican crime may well have spelled the difference between a jury divided 10 for acquittal to 2 for conviction of second degree murder and a jury unanimous for first degree murder. Proof of an intent to rape was crucial to the prosecution's felony murder theory, and proof of the Mexican crime was crucial in proving an intent to rape. Had the jury been allowed to consider the determination of the Mexican tribunal, its consideration of the evidence of that crime would have been materially affected. We therefore conclude that in the absence of the error it is reasonably probable that a result more favorable to defendant would have been reached. Accordingly, the error resulted in a miscarriage of justice,

[2] It is noteworthy that under the new Evidence Code judgments of felony conviction are made admissible evidence under certain circumstances. (Evid. Code, § 1300.)

[3] The Mexican judgment stated that any injuries to Amanda Encinas were caused by Willie Kerr, her common law husband, and that any sexual relations between defendant and Amanda were not the result of physical or moral violence or force. Amanda had complained that she had been forcibly raped; defendant declared that she had offered to have intercourse for five dollars.

Because of the requirement of proof of guilt beyond a reasonable doubt, evidence of an acquittal is not, of course, as convincing of innocence as a judgment of conviction is convincing of guilt; but this fact goes to the weight not the admissibility of the evidence.

and the judgment must be reversed. (Cal. Const., art. VI, § 13; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

We discuss one further issue because the question is likely to arise again at a new trial. On cross-examination by defendant, Eddie Seay denied that he had ever told investigating officers of an arrangement whereby defendant was to sleep with Essie Mae in return for a payment of money to Seay. In an offer of proof, defendant wished to impeach this statement by an officer's testimony to the effect that he had been told by Seay that Seay's buddies had told Seay that he had made such an arrangement with defendant. Seay had not been asked on cross-examination if he had told the investigating officers of the information given him by his friends, and the notes of the investigating officer state that Seay denied ever making any such arrangement, although he admitted that he was intoxicated at the relevant time. The statement offered by defendant was not inconsistent with Seay's testimony that he had never told the officers that he had made the arrangement with defendant. The trial court did not abuse its discretion in refusing the evidence. (See *Western Union Oil Co.* v. *Newlove*, 145 Cal. 772, 775-776 [79 P. 542].)

The judgment is reversed.

Peters, J., Tobriner, J., Sullivan, J., and White, J.,† concurred.

BURKE, J.—I dissent. In my opinion it is not reasonably probable that a result more favorable to defendant would have been reached had the evidence of his acquittal of the Mexican crime been admitted at his trial on guilt. (Cal. Const., art. VI, § 13;* *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) Evidence of that acquittal was admitted at the penalty trial, and it is apparent that it had no effect upon the jury since the jury returned the death penalty.

There is overwhelming evidence that defendant killed Essie Mae Hodson in the perpetration of, or attempt to perpetrate, rape. Evidence of the incident in Mexico several weeks later, indicating a similar plan, scheme and design was highly relevant as to defendant's illicit motives in introducing himself into the household of an acquaintance. Whether in the Mexi-

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

can incident he accomplished his objectives by means of rape by force or by inducement was relatively unimportant. It was the bearing which the Mexican incident had on his intentions which was significant.

I would affirm the judgment in its entirety.

McComb, J., concurred.