[Crim. No. 5165. Third Dist. June 12, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBBIN LEE COLEMAN et al., Defendants and Appellants.

724

### COUNSEL

Robert F. O'Neal, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Roger E. Venturi and Anthony M. Skrocki, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

JANES, J.—A jury found defendants guilty of first degree robbery. They appeal,[1] contending that (1) the trial court prejudicially restricted their cross-examination of the complaining witness; (2) a statement of defendant Coleman was received in evidence in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; and (3) the trial court should have instructed the jury, *sua sponte,* on the degrees of robbery and on lesser included offenses.

#### The Evidence

The victim, Phillip Harich, was hitchhiking along Interstate 80, about dusk, when he was given a ride by defendants in a 1962 beige Ford Galaxie

---

[1]Defendant Coleman was sentenced to state prison; Browning was granted probation. The notice of appeal was filed by Coleman "on behalf of" himself and defendant Browning. Although the notice of appeal was not signed by Browning, it was signed by the trial attorney for the two defendants. Rule 1, California Rules of Court, requires that a notice of appeal be signed "by the appellant or by his attorney" but provides that such notice "shall be liberally construed in favor of its sufficiency." We will treat both defendants as parties to the present appeal, and the appeal of Browning as taken from the order granting probation (Pen. Code, § 1237, subd. 1).

4-door sedan driven by Coleman. At defendants' direction, Harich entered the right front door of the car and took his seat at the window, with Browning sitting next to the driver.

Harich, a 17-year-old Canadian alien, had left Canada 10 days earlier and traveled down Interstate 5 to the Haight-Ashbury district of San Francisco. On the evening in question, he was hitchiking back to British Columbia. Unfamiliar with the area, and confused by the highway interchanges, Harich was trying to get onto Interstate 5 when he was picked up by the defendants east of Sacramento.

As the car proceeded east toward Reno, the three men engaged in conversation, during which Harich told Coleman that he was en route to Vancouver, British Columbia; Coleman replied that the defendants were going to Seattle. After a discussion of comparable job opportunities in the two countries and other small talk, Harich dozed off intermittently, assuming that the driver would somewhere turn onto Interstate 5 from Interstate 80.

About 11 p.m., in the vicinity of the Donner Lake interchange, Coleman turned off Highway 80 under the pretext of taking some infrared pictures in the dark and drove for several miles on a secondary road. Upon stopping, Coleman reached under the dashboard of the car and brought out a pistol. Browning also produced a gun. Coleman pointed his pistol at Harich's head and Browning held his at the victim's chest. Upon their demand, Harich placed all his money—$55 (4 tens, 3 fives and some coins)—on the dashboard and was then ordered out of the car and directed down a nearby incline.

A few minutes after defendants made a U-Turn and drove away, Harich clambered back up the slope and walked a mile and a half to a motel, reaching it about midnight. He then telephoned the sheriff's office. Two officers came to the motel, questioned him, went with him to the scene of the robbery, and then through their dispatcher put out an armed robbery report and a bulletin on the car which Harich described to them.

Defendants were apprehended several hours later in downtown Reno by two city policemen who had received a report of the robbery and stopped them in Coleman's car. Two pistols (later identified by Harich as to type), one loaded, the other empty but with shells nearby, and both operable, were removed from the car in a precautionary search that is not questioned, and defendants submitted to and were identified by Harich in a lineup fairly conducted and upon which no attack is made. When booked, Browning was found to have $58.46—2 twenties, 1 ten, 1 five, 3 ones, and some coins—and Coleman 19 one dollar bills, plus some small change.

Both defendants testified at trial, admitted they gave Harich a ride toward Reno—but from Colfax, not from the outskirts of Sacramento, as Harich had testified—and admitted leaving him in an uninhabited area near Donner Lake. They testified that they left him there in order to give him a "bum ride" after an argument arose from his expressions of anti-Vietnam war sentiment, and that they then went on to Reno to celebrate Coleman's birthday and did some gambling. They denied threatening Harich with the weapons and taking any money from him. Their suggestion was that Harich, incensed by the rude treatment, fabricated his story in order to gain revenge and thus to obtain $55 of their money.

## I

Defendants' first assignment of error pertains to a ruling sustaining the prosecutor's objection to a question by defense counsel during the latter's cross-examination of the robbery victim. They contend that in the course of the following exchange the trial judge prejudicially curtailed their cross-examination of Harich as to the source of the money he claimed was taken from him by the defendants:

"Q. (By Mr. Hager, counsel for defendants): When you left Vancouver, Phillip, how much money did you have? A. I had $5.00.

"Q. $5.00. All right. And you remember how much you had when you arrived in San Francisco? A. Around three-fifty.

"Q. Three dollars and a half? A. Yes.

"Q. And you worked when you were in San Francisco?

"A. Not really, depending on what you mean.

"Q. Well, I mean work. Did you earn any money when you were in San Francisco? A. Yes, I did.

"Q. What did you do for that?

"Mr. MacMillen (prosecutor): Object to that as being irrelevant and immaterial.

"Mr. Hager: "It's very material. I think it's important we establish a basis where this money came from.

"The Court: Objection sustained."

There was no further argument in support of the question, no offer of proof and the matter was not pursued.

The predication of error is two-pronged; both attacks relate to a trial defense which took the stance that Harich was a young, impecunious run-

away who fabricated his story for the purpose of revenge and to obtain money from the defendants.

Defendants point out first that the possession of money by Harich was an essential element of the crime charged against them, and that since Harich had reached San Francisco with only a few dollars in his pocket, it was unlikely that he would be in possession of the amount of money which he claimed was taken from him. Secondly, it is asserted that the exchange quoted was the beginning of an attack on the victim's credibility, which was put strongly in issue by the many contradictions between his testimony and that of the defendants.[2]

We need not linger on the first of the arguments. Neither the quantity nor the particular amount of money possessed by the victim was material to any issue in the case (*People* v. *Simmons* (1946) 28 Cal.2d 699 [172 P.2d 18]), although admittedly if it were established that Harich did not have the $55 in hand when he was picked up, such proof would at least invite a suspicion that he had no funds at all, or that no money was taken from him. The record demonstrates, however, that the inquiry in question was not directed to establishing the amount of money in the victim's possession, but rather the source of such funds. Harich was asked what he *did* for the money he earned in San Francisco, and, as we have shown, defense counsel argued at the close of the exchange that it was important to "establish a *basis* where this money came from." (Italics added.) In the face of the general objection to the question "as being irrelevant and immaterial" and the court's ruling sustaining the prosecutor's objection, defense counsel then dropped the matter.

The Attorney General suggests that the trial judge may have concluded that defense counsel, in addition to inquiring into the activities of Harich or the source of his funds was in fact mounting an attack on the amount of funds in his possession, and that since the crime of robbery does not depend upon the value of the property taken, his ruling was proper (*People* v. *Simmons, supra,* 28 Cal.2d 699). On the other hand—it is alternatively suggested—the trial judge may have believed that the inquiry was intended to establish that Harich acquired the money in some illicit or socially unacceptable manner, particularly in view of his stay in the Haight-Ashbury district of San Francisco, and that Harich was entitled to protection against such effort to intimidate, embarrass, or unfairly discredit him. (Evid. Code,

---

[2]Although we have set out the facts most favorably to the People (*People* v. *Redmond* (1969) 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321]), the evidence was in conflict, as is shown by our summary of defendants' testimony. In addition to the contradictions shown, defendants claimed to have discussed in the presence of Harich the fact that Browning had a sum in excess of $50 from which he planned to pay his house rent the following day.

§ 765; *People* v. *Corlett* (1944) 67 Cal.App.2d 33 [153 P.2d 595, 964]; see *People* v. *Dukes* (1966) 241 Cal.App.2d 488, 493, fn. 7 [50 Cal.Rptr. 609].)

The opposing contentions emphasize the fact that the question which provoked the prosecutor's objection was at least ambiguous, if not capable of several meanings; the trial judge was therefore entitled to be apprised of the direction of counsel's inquiry. ■ We are acquainted, of course, with the rule that no offer of proof is necessary as a prerequisite to raising on appeal the prejudice resulting from ruling out a pertinent question asked on cross-examination. (See, Witkin, Cal. Evidence (2d ed. 1966) § 1314, p. 1214; Witkin, Cal. Criminal Procedure (1963) § 437, p. 438.) It found early expression in recognition of the fact that counsel may lose the benefit of cross-examination if he is required on pain of an exclusionary ruling to disclose to the court and opposing counsel what he expects to bring forth by his questions. (*People* v. *Jones* (1911) 160 Cal. 358, 363-364 [117 P. 176]; see, also *Tossman* v. *Newman* (1951) 37 Cal.2d 522, 525-526 [233 P.2d 1].) The rule exempting the cross-examiner from the requirement of an offer of proof has received its strongest application, however, in cases where—absent such offer—an entire class of evidence or all evidence upon a particular subject or issue has been excluded. (See *Dillenbeck* v. *City of Los Angeles* (1968) 69 Cal.2d 472 [72 Cal.Rptr. 321, 446 P.2d 129]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81 [147 P.2d 604]; *MacGregor* v. *Kawaoka* (1955) 132 Cal.App.2d 407 [282 P.2d 130]; *Costa* v. *Regents of Univ. of California* (1953) 116 Cal.App.2d 445 [254 P.2d 85].)

The requirement of an offer of proof by counsel, and the traditional exception protecting the cross-examiner from possibly harmful disclosure of the direction of his inquiry have found statutory expression in California Evidence Code section 354: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the question asked, *an offer of proof,* or by any other means; (b) The rulings of the court made compliance with subdivision (a) futile; or (c) The *evidence was sought by questions asked during cross-examination or recross-examination."* (Italics added.)

Notwithstanding these decisional and statutory criteria, a balance is required between the cross-examiner's right to effective cross-examination and the essential fairness and finality of trials; discretion must abide in

the trial judge who is faced wtih objection to an inquiry by the cross-examiner in an area of the evidence or upon an issue of which the trial judge is unaware, or as to which it is apparent he has overlooked the trial materiality.

*People* v. *Burton* (1961) 55 Cal.2d 328 [11 Cal.Rptr. 65, 359 P.2d 433] illustrates the measure of discretion left with the trial judge to weigh exceptional circumstances against the cross-examiner's exemption from the requirement of an offer of proof: In a prosecution for lewd conduct with a 7-year-old girl, counsel for defendant, on cross-examination of the victim, asked her "has anybody else done this to you?" The prosecutor objected that "[I]t goes beyond the scope of the direct examination. There is no purpose to it." The court ruled "[I]t is incompetent, irrelevant and immaterial, besides." The Supreme Court pointed out, at page 344, that the ruling was mistaken because there were possible answers that would have been material.

Stating the rule of *Jones* and *Tossman, supra* (that it is unreasonable to require an offer of proof on exploratory cross-examination), the *Burton* court held that rule inapplicable, since it was clear from the judge's comment on ruling that he was overlooking the fact the question might have a proper purpose.[3] And in *People* v. *Lancaster* (1957) 148 Cal.App.2d 187 [306 P.2d 626], a robbery case in which defense counsel, in cross-examining a prosecution witness, failed to explain the relevancy of a question put to the prosecution witness, the court commented at page 196: "If considering the data available to the trial court its exclusion of a question as irrelevant or immaterial is not an abuse of discretion, the appellant cannot for the first time on appeal attack the discretion on grounds which he could have proffered in the trial court but did not disclose. A contrary rule would enable a party secretly to reserve a means of reversal in case the judgment went against him."

The situation facing the court in the present case was persuasively similar to those depicted in *Burton* and *Lancaster*. ■ In the face of an objection by the prosecutor and the statement of defense counsel, it should have been clear that the judge was unaware of the materiality of the question if, indeed, it had a material purpose; the judge did not suggest that counsel refrain from further related inquiry; and defense counsel made no offer of proof or other attempt to explain a relevant purpose of the question, but abandoned the direct line of inquiry and moved on to proper and related

---

[3]"However, when the trial judge, by his general ruling that the inquiry was 'incompetent, irrelevant and immaterial,' showed that he was overlooking the fact that it might have a proper purpose, we think that defense counsel should have indicated to the judge the theory on which he based his question. Instead, he went on to a different line of inquiry." (*Burton, supra*, pp. 344-345.)

questions touching upon the amount and denominations of money on the victim's person on his departure from San Francisco.

There was no abuse of discretion upon which error can be predicated. ■ Evidence Code section 354 above-quoted does not *compel* a conclusion, absent an offer of proof (§ 354, subd. (a)), that curtailment of cross-examination may be considered on appeal when "[t]he evidence was sought by questions asked during cross-examination or recross-examination" (§ 354, subd. (c)). The comments of the Law Revision Commission (7 Cal. Law Revision Com. Rep. (1965) p. 1044) make clear that section 354 reflects existing law, and although only the *Jones, Lawless* and *Tossman* cases are cited in explanation of the comment, we take the comment at face value in recognizing, as existing law, the later rule of *Burton* and *Lancaster.* (See, also *People* v. *Jones* (1960) 180 Cal.App.2d 95, 98 [4 Cal.Rptr. 98]; *People* v. *Bryant* (1960) 157 Cal.App.2d 528, 532-533 [321 P.2d 45]; *People* v. *Hunter* (1957) 147 Cal.App.2d 472, 477 [305 P.2d 608].)

## II

■ Defendants' contention that a statement by defendant Coleman was received in evidence in violation of the *Miranda* rule arises from the following circumstances: Before defendants were stopped in Reno, the arresting officers had received from their police dispatcher an "A.T.L. ("attempt to locate") bulletin on Coleman's car. One of the officers testified that when Coleman "wanted to know why we stopped him, I advised them that we had an armed robbery on Interstate 80 near Donner Lake and he was a possible suspect." Coleman replied that "we're all right from that. We come down Highway 50."

At trial, defendants admitted that Coleman's statement was in fact a lie, and both testified, as we have shown, that they actually picked the victim up on Interstate 80 and later followed that route into Reno. They argue on appeal that after admission of Coleman's statement they had no alternative but to testify at trial, admit the lie, and point out that Coleman's utterance was the product only of surprise and ordinary apprehension at being stopped by the police. Based on the admitted absence of the usual *Miranda* admonition, they charge constitutional error.

Coleman's statement was used in the prosecution's case-in-chief to show defendants' consciousness of guilt. No objection was made at trial to introduction of the statement[4] and there was, in any event, no error. (*People* v.

---

[4]Unlike complaints of coerced confessions, an objection that an inculpatory statement was taken without complying with the *Miranda* warning must first be made in the trial court as a prerequisite to consideration of the point on appeal. (See, *In re*

*Green* (1965) 236 Cal.App.2d 1, 12 [45 Cal.Rptr. 744]; *People* v. *Gressman* (1965) 235 Cal.App.2d 684, 687 [45 Cal.Rptr. 726].) The statement was not a product of custodial interrogation. Nor was defendant's own question and his volunteered statement an interrogation. Coleman was questioning the officer, by whom there had been no initiation of questioning.[5]

<h2 style="text-align:center">III</h2>

■ Lastly, defendants attack the jury instructions, contending that the court's failure to give certain instructions *sua sponte* deprived defendants of the opportunity for a verdict other than first degree robbery or acquittal. The court properly defined robbery in terms of the standard instruction.[6] The court then instructed: "Robbery which is perpetrated by torture or by a person or by two or more persons any one of them being armed with a dangerous or deadly weapon[7] is robbery in the first degree. All other kinds of robbery are of the second degree."[8]

Before giving the latter standard instruction, the court *deleted* from the instruction this final sentence: "If you should find the defendant guilty of robbery, it will be your duty to determine the *degree* thereof and to state that *degree* in your verdict." (Italics added.)

Despite the court's general differentiation between the two degrees of robbery, it is apparent from the instructions as a whole that the court effectively removed from the jury the possibility of bringing in a verdict of robbery of the second degree;[9] defendants assign the omission as error.

■ No principle of law is better recognized than the rule that in a

---

*Dennis M.* (1969) 70 Cal.2d 444, 462 [75·Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Castro* (1968) 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62].)

[5]"By custodial interrogation, we mean questioning *initiated by law enforcement officers after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* p. 444 [16 L.Ed.2d at p. 706].) (Italics added.)

[6]Former CALJIC 210; now CALJIC 9.10, with modifications.

[7]An instruction in standard form was also given defining "dangerous or deadly weapon" (former CALJIC 210-B (Rev.); now CALJIC 9.13, with modifications).

[8]Former CALJIC 210-A; now CALJIC 9.11, with modifications.

[9]We do not accept the Attorney General's suggestion that, since the instructions we have quoted are definitive of the statutes defining robbery (Pen. Code, § 211) and the degrees thereof (Pen. Code, § 211a), the instructions were necessarily complete and correct in the absence of a more detailed request by defendants. Omitted therefrom, in addition to the deleted reference to the jury's duty in finding the degree of the offense and stating such degree in their verdict is the mandate that if the jury entertains a reasonable doubt in which of two degrees a defendant is guilty, he can be convicted only of the lower of such degrees (Pen. Code, § 1097). See, *People* v. *Dewberry* (1959) 51 Cal.2d 548, 555-556 [334 P.2d 852].)

criminal case the court must, even without request, instruct the jury on all general principles of law pertinent to the issues raised by the evidence. (See, Witkin, Cal. Criminal Procedure, *supra,* § 471, pp. 477-478 and cases cited.) The "general principles of law governing the case" are "those principles of law commonly or closely and openly connected with the facts of the case before the court." (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]—quoting from *People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].) ■ However incredible a defendant's testimony, he is nevertheless entitled to an instruction based on the hypothesis that it is entirely true, and it is prejudicial error to withdraw from the jury consideration of such evidence. (*People* v. *Carmen* (1951) 36 Cal.2d 768 [228 P.2d 281].)

■ Both by definition and of necessity the "facts of the case" must be analyzed, however, in their context before the trial court and jury in order to determine whether, in a particular case, the trial court complied with its obligation to provide the jury with the proper legal rules for resolution of the issues raised by the evidence. (*People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820].)

■ Under the evidence here presented, and the theory first of the prosecution and then the defense, either there was an armed robbery or there was no robbery at all.[10] The evidence permitting of only the two possible conclusions, it was thus unnecessary for the court to instruct the jury that the defendants could be convicted of second degree robbery, because that degree of crime was not pertinent to any theory of the case or the evidence produced. Fabrication by the victim, not robbery without weapons, was the trial theory of the defendants, and trial counsel might have opposed as strongly the suggestion of a conviction of second degree robbery as appellate counsel now attacks the claimed omission on the part of the trial court. (See *People* v. *Allison* (1966) 245 Cal.App.2d 568, 575 [54 Cal.Rptr. 148].)

We have had occasion to observe that "overbroad appellate demands for *sua sponte* instructions tend to hamper the tactical choices of defense attorneys and put trial judges under pressure to glean legal theories and

---

[10]Defense counsel emphasized, in his argument to the jury, that the case required the jury's determination of a single issue, i.e., "did the defendants, these two young men, take property from Mr. Phillip Harich by force or fear through the use of deadly weapons? That is the thing, the point, the issue which you must determine. It's not a question on whether these two gentlemen took this boy on a bum ride. It's not a question why they happened to be armed, whether they was [*sic*] or whether they were acting lawfully or unlawfully in carrying pistols around with them. That's not the point here. The point is, as I have explained to you, did this particular act occur as Mr. Harich says it did, or did these boys simply drive him up there as a real bad practical joke and kick him out of the car?"

winnow the evidence for remotely tenable and sophistical instructions. They also supply defense counsel an opportunity to capitalize on invited error by failing to request an instruction thinly supported by meager evidence, then utilizing its absence as an argument for appellate reversal." (*People* v. *Chapman* (1968) 261 Cal.App.2d 149, 174 [67 Cal.Rptr. 601]; see also *People* v. *Rodriguez* (1969) 274 Cal.App.2d 487, 494 [79 Cal.Rptr. 187]; *People* v. *Crawford* (1968) 259 Cal.App.2d 874, 878 [66 Cal.Rptr. 527].)

What we have said applies with equal force to defendants' claim of entitlement, without request at trial, to instructions on suggested lesser offenses. Their contention is that the trial court should have instructed—again on its own motion—on the offenses of carrying concealed firearms without a license (Pen. Code, § 12025) and commission of acts which seriously endanger public peace or health (Pen. Code, § 650½.)

The contention is self-destructive; omission of the two instructions was not error. "The jury . . . may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged. . . ." (Pen. Code, § 1159.) "The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense." (*People* v. *Greer* (1947) 30 Cal.2d 589, 596 [184 P.2d 512].) Violation of section 12025 is not "necessarily included" within the offense of robbery. If defendants had been licensed to carry their firearms or the firearms were not concealed, defendants nevertheless could have committed the robbery. (See, *In re Hess* (1955) 45 Cal.2d 171, 174 [288 P.2d 5]; *People* v. *Pater* (1968) 267 Cal.App.2d 921, 924-925 [73 Cal. Rptr. 823]; Witkin, Cal. Criminal Procedure (1963) §§ 541-543, pp. 552-555.) Section 650½ applies only to acts not otherwise punishable under the Penal Code. (See *In re Bevill* (1968) 68 Cal.2d 854, 862 [69 Cal.Rptr. 599, 442 P.2d 679].)

## IV

Although not discussed in the briefs, we note that the judgment against Coleman recites that he "was found to have been armed with a deadly weapon at the time of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code sections 969c and 3024." Quite apart from the fact that the information did not charge possession of such weapons either separately or with the specificity required by Penal Code section 969c, the finding may not stand inasmuch as the jury did not pass separately on that question.[11] (*People* v.

[11]The degree of the instant robbery is not affected thereby. A defendant may be convicted of first degree robbery absent allegation in the information or finding by

*Ford* (1964) 60 Cal.2d 772, 794 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Washington* (1966) 243 Cal.App.2d 681, 687 [52 Cal.Rptr. 668].) Further, the finding must be stricken on compulsion of *People* v. *Floyd* (1969) 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862] (filed since trial of the present action), where it was pointed out that sections 3024 and 12022 of the Penal Code are inapplicable to first degree robbery convictions, since they are general sections "providing for extra punishment for the use of certain weapons in the commission of felonies generally." (*Floyd, supra,* pp. 883-884; see *People* v. *Brewster* (1969) 276 Cal.App.2d 750 [81 Cal.Rptr. 237].)

The judgment against defendant Coleman and order granting probation to defendant Browning are affirmed insofar as the finding of guilty of first degree robbery is concerned. The recital contained in the abstract of judgment against defendant Coleman that he was armed with a deadly weapon is stricken.

Friedman, Acting P. J., and Regan, J., concurred.

---

the jury that the defendant was armed. "The distinction to be drawn here is that although a first degree robbery conviction may be sustained where the information does not allege the use of a deadly weapon, Penal Code section 969c requires that before the additional penalties of Penal Code sections 3024 and 12022 may be imposed by the above indicated 'armed clause,' there must be both a prior allegation of the use or possession of a deadly weapon and a finding supported by substantial evidence. (Citations.)" (*People* v. *Washington, supra,* 243 Cal.App.2d at p. 687.)