James SPEAKS, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–6.

District of Columbia Court of Appeals.

Submitted Dec. 1, 1992.

Decided Dec. 18, 1992.

David B. Smith was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese III, Silvia L. Gonzalez and Peter V. Taylor, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, TERRY, and STEADMAN, Associate Judges.

PER CURIAM:

Appellant was charged with first degree murder while armed, D.C.Code §§ 22–2401 and –3202 (1989 Repl. & 1992 Supp.), carrying a pistol without a license, D.C.Code § 22–3204(a) (1989 Repl. & 1992 Supp.), and possession of a firearm during a crime of violence or dangerous offense, D.C.Code § 22–3204(b) (1989 Repl. & 1992 Supp.). On the fifth day of its deliberations, the jury indicated that it was deadlocked. On appellant's motion, the court declared a mistrial. After the court discharged the jury, some jurors spoke with counsel for both parties. This discussion, continued before the court, suggested that on the second day of deliberations the jury may in

fact have unanimously found appellant not guilty of the first degree murder charge but had thereafter been unable to come to agreement on the lesser included offense of second degree murder. Afterwards, appellant moved for an order barring his retrial on the charge of first degree murder or, alternatively, for an order accepting a verdict of not guilty on that charge. The court's denial of this motion is the basis of this interlocutory appeal.

Appellant contends that the trial court erred (1) by failing, *sua sponte*, to instruct the jury about partial verdicts and to inquire whether it had reached such a verdict; (2) by finding that appellant's motion for mistrial waived any potential double jeopardy claim; and (3) by refusing to. release appellant from pretrial detention on the basis that the results of the trial rebutted the presumption of dangerousness established by D.C.Code § 23–1325(a) (1989 Repl. & 1992 Supp.). Incorporating by reference the sound and thorough opinion by Judge Kramer ruling on appellant's motion, we affirm as to the first two claims of error. Because no verdict was entered, as the trial judge correctly ruled, appellant remains charged with first degree murder, and the presumption of § 23–1325(a) still applies; thus, because the circumstances surrounding appellant's original bond hearing have not changed, Judge Kramer did not err in refusing to revoke his pretrial detention.

*Affirmed.*

## APPENDIX

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CRIMINAL DIVISION— FELONY BRANCH

Crim. No. F–2245–91

United States of America

v.

James A. Speaks

### MEMORANDUM OPINION AND ORDER

Filed Dec. 20, 1991

This matter is before the court upon defendant's motion for an order barring his retrial on the charge of first degree murder while armed or, alternatively, for an order accepting a verdict of not guilty on the first degree murder charge. The government opposes the motion and requests that all counts of the indictment be submitted to the jury at defendant's retrial.

The motion presents the issues of whether a deadlocked jury can impeach its verdict after it has been discharged; whether the court is required, in the absence of a request from counsel or an indication of confusion from the jury, to instruct on or inquire about the return of a partial verdict; and whether, assuming the court has such an obligation, a defendant waives any right to assert a Double Jeopardy bar to retrial when he has moved for a mistrial. Having considered the arguments of both parties and after review of the pertinent authorities, the court concludes that defendant's motion should be denied.

### FACTUAL BACKGROUND

The defendant was charged with one count each of first degree murder while armed (premeditated murder), carrying a pistol without a license, and possession of a firearm during a crime of violence. After a trial which began on November 7, 1991, the defendant requested that in addition to the instructions on each offense charged in the indictment, the jury be instructed on second degree murder while armed as a lesser included offense of first degree murder while armed. This request was granted.

During the course of the instructions, the jury was told that it should consider each offense and the evidence which applied to it separately and should return separate verdicts as to each count. The court instructed the jury that a finding of guilty on any one charge should not control or influence its verdict on any other charge. In explaining how to communicate with the court, the court provided the jury with the standard language in Instruction 2.72 cautioning the jury never to reveal to anyone, not even to the court, how the jury stands "numerically or otherwise" on the question of the guilt or innocence of the accused until after they

had reached a unanimous verdict. *See* Criminal Jury Instructions for the District of Columbia, No. 2.72 (3d ed. 1978). The court then went on to elaborate, explaining to the jury that their internal preliminary votes are the jury's business, not the court's. At the end of the instructions, the court invited the jury to submit to the court any questions that might arise during the course of deliberations if the jurors believed the court could be of assistance in answering those questions.

A verdict form containing questions about the jury's conclusions on the guilt or innocence of the defendant with respect to each of the charges was given to the jury to be used as a guide during deliberations. The court informed the jury that the verdict form would not be used for accepting a verdict and explained that the verdict on each charge individually would be taken in open court, with the foreperson announcing "guilty" or "not guilty" in response to questioning by the court.

On Monday, November 18, 1991, at approximately 9:50 a.m., the jury began its deliberations and at approximately 12:40 p.m., submitted a note to the court stating, "It seems we are unable to come to a unanimous decision. We need help." With concurrence of counsel for both sides, the court responded by simply instructing the jury to continue its deliberations.

The jury continued to deliberate on November 18 and November 19, until approximately 4:30 p.m. on November 19, when it submitted a note which read, "We, the jurors, have still been unable to agree on a unanimous decision. We have argued, discussed, and disputed. Still, *no decision has been reached.* It appears to be a useless case in terms of agreement." The jury was excused for the day and instructed to return the next morning. On November 20, 1991, the jury was given the standard "red book" *Winters* instruction concerning

jury deadlock and was excused to continue its deliberations.[1]

The jury then deliberated throughout the day on November 20 and continued its deliberations on November 21. On November 21, at approximately 10:15 a.m., the jury foreperson submitted a note stating that one of the jurors had been informally diagnosed with the skin condition known as "shingles." Several jurors believed that the condition was contagious and were concerned about further deliberations. The jury ceased deliberations for the afternoon while the juror who was thought to have shingles visited a dermatologist, as arranged by the court. The dermatologist determined that the juror did not have shingles, but merely a condition commonly known as hives. The jury returned again on November 22 and, after being informed that the individual juror did not have shingles, the jury was excused to continue its deliberations.

At 11:35 a.m. on November 22, the jury submitted two notes to the court, one from the foreperson and one from an individual juror. The note from the foreperson read, "This is to inform you up to this present time we still have not come to an agreement." The note from the individual juror read:

> This is a note from me and me only. It has been determined, in my opinion, that no one is going to change their minds. From sitting in deliberations for a week, I have watched tempers flare, attitudes have arose, constant snapping at one another and it is getting worse each day. I know this is not what you want to hear but I personally cannot take another day of deliberations if everyone cannot get along.[2]

At this point, out of the presence of the jury, the court said to counsel, "I don't know about you counsel. I'm ready to excuse them, but I want to hear from you."[3] The prosecutor responded, "I do

1. *See Winters v. United States,* 317 A.2d 530, 533–34 (D.C.1984); Criminal Jury Instructions for the District of Columbia, No. 2.91 (3d ed. 1978).

2. During the five days of deliberations, the only other notes received by the court involved a request for a blackboard, marker and tape, and

a request to see two exhibits, only one of which had been admitted into evidence.

3. Although no transcript of these proceedings has yet been prepared, the court notes that it was able to utilize the tape recording of the proceedings to determine precisely what was said by the various participants.

not oppose that your honor; whatever [defense counsel] wishes." Defense counsel then stated, "Your honor, at this time I'll make a motion for a mistrial." The motion was granted without government objection.

The jurors were then brought into the courtroom and the court, referring to the two notes from the jury, stated, "I gather that this means that you have not been able to reach verdicts in the case. You have deliberated for a long period of time. I believe it is time to excuse you. It appears, if I understand correctly, that there is no realistic prospect that you will be able to reach a verdict in this case." Several jurors nodded agreement to the court's assessment of the deadlock and none voiced dissent. Neither counsel requested that the court poll the jury to determine if all members agreed there was a deadlock.

After consulting with counsel, the court instructed the jurors that, once discharged, they were free to discuss the case with anyone, including counsel. The court invited any jurors who were interested to wait in the juryroom. The court then discharged the jury and took the luncheon recess to enable counsel to speak with any jurors who had remained, directing counsel to appear in the afternoon for the setting of a new trial date.

When the case was recalled after the luncheon recess, the court noticed that the foreperson was seated in the front row of the courtroom and asked counsel to approach the bench. During the bench conference, the court ascertained that after the discharge of the jury, both counsel had gone to the juryroom, as permitted, and spoken with an unspecified number of jurors who had remained. The jurors had the opportunity to ask questions of counsel about the case, which were answered. During this discussion, and with both counsel present, reference was made to jurors who had found defendant not guilty on the first degree murder charge. Both counsel agreed it was not clear at that time that all of the jurors had found the defendant [not] guilty on that charge. Nor did the jurors mention any written expression of this opinion at that time. After the prosecutor

departed, defense counsel spoke further with some jurors, including the foreperson. Defense counsel represented to the court that the jurors' further remarks caused him to believe that the jury had unanimously reached a decision of not guilty with respect to the charge of first degree murder while armed.

Defense counsel also represented that when he spoke further with the foreperson, she gave him a vote sheet, which defense counsel provided to the court. The sheet stated, "We the jury find *James A. Speaks* not guilty on the charge of first degree murder while armed—premeditated murder," and listed all twelve jurors' numbers. The vote sheet was not dated. According to defense counsel, the foreperson indicated that the jury did not know that it could render a verdict on the first degree murder charge alone and continued to disagree up to the time of discharge on the charge of second degree murder, with eight jurors voting to convict and four voting to acquit.

After further discussion with counsel, the court asked the foreperson to approach the bench so that she could be excused. The court explained that it had been presented with the vote sheet, informed the juror that she might be called back at a later time, and directed her not to discuss this aspect of the case with anyone. The foreperson informed the court that the vote on the first degree murder charge had been taken on Tuesday morning, November 19, 1991. According to the foreperson, she had asked her fellow jurors if she should inform the court of the unanimous vote for acquittal, and was told not to do so because the other jurors believed they were required to reach verdicts on all counts before returning their verdicts. After setting a date for the filing of memoranda on the issue, counsel were then excused.

In his motion, defendant does not request that the court recall the jury to poll them on whether they had reached a final and unanimous decision to acquit defendant on first degree murder. Rather, counsel contends that the court committed plain error by not *sua sponte* instructing the jury that it could return a partial verdict or

by not inquiring whether a partial verdict had been reached on the first degree murder charge before discharging the jury. He argues that because of this error, the Double Jeopardy Clause prohibits his being retried on that charge. Defendant requests that the court enter an order barring his retrial on the first degree murder charge or, alternatively, enter a verdict of not guilty on that charge, which would have the same effect.

Although defendant did not request the court to recall the jury, the court has examined the precedent on the issue of recall and has concluded that the jury should not be recalled in order for an inquiry to be made about an internal and unannounced vote taken before its discharge. The court further concludes that it cannot use the foreperson's statements, made after discharge and dispersal of the jury, as a basis for barring a retrial or entering a verdict of not guilty on the first degree murder charge. Finally, the court concludes that no *sua sponte* instructional obligation existed in this case requiring the court to give a partial verdict instruction and, in any event, that defendant waived any Double Jeopardy claim he might otherwise have by moving for a mistrial.

## ENTERING A VERDICT

■ As an initial matter, the court has examined the question of how it should treat the post-trial disclosure of the foreperson and the vote sheet which she proffered. As discussed below, a rule of this court and the case law interpreting the rule make clear that the statements of the foreperson and the vote sheet are not the equivalent of a verdict. Thus, the court cannot simply enter a verdict of not guilty, as defendant requests.

The question of whether a verdict of not guilty on first degree murder could now be entered is governed by Rule 31(a) of the Superior Court Rules of Criminal Procedure. That rule provides that verdicts "shall be returned by the jury to the judge in open court." Super.Ct.Crim.R. 31(a).

Furthermore, Rule 31(d) provides for a poll of the jury after the verdict is returned but before it is recorded. If the poll indicates that there is not unanimous concurrence, "the jury may be directed to retire for further deliberations or may be discharged." Super.Ct.Crim.R. 31(d). Thus, Rule 31(d) demonstrates that up until the time that the poll is actually complete, any juror has the opportunity to change his or her mind. Accordingly, the language of Rule 31 makes clear that neither the statement of the foreperson nor the vote sheet proffered could be a verdict, because neither was announced or presented by the jury in open court, where the parties would have an opportunity to poll the jury. *See Thomas v. United States*, 544 A.2d 1260, 1261–64 (D.C.1988); *Lewis v. United States*, 466 A.2d 1234, 1238–39 (D.C.1983); *Jones v. United States*, 273 A.2d 842, 844 (D.C.1971); *United States v. Love*, 597 F.2d 81, 84 (6th Cir.1979).

■ In any event, there is no reliable basis in the record for concluding that by the time of its discharge, the jury in this case had reached a final, unanimous decision to acquit the defendant on the charge of first degree murder. As the court noted in *People v. Griffin*, 66 Cal.2d 459, 58 Cal.Rptr. 107, 426 P.2d 507 (1967) when confronted with a similar situation, the vote, assuming its validity, may reflect that jurors favoring first degree murder over second degree murder were temporarily compromising in an effort to reach unanimity. *Id.* at 463, 58 Cal.Rptr. at 110, 426 P.2d at 510.

The possibility that the vote reported by the foreperson was only a temporary compromise appears to be a substantial one in this case. After only three hours of deliberations, the foreperson reported that the jury was unable to reach a unanimous decision. The next note from the foreperson, after the time the vote for acquittal on the first degree murder charge was reportedly taken, unequivocally stated that the jury could not reach a unanimous decision, repeated that no decision had been reached, and concluded "it appears to be a useless case in terms of agreement."[4] This lan-

---

4. The court notes that this language did not refer to the jury's inability to reach unanimous "decisions," in the plural, which would have been consistent with the present claim that the jury believed it had to reach decisions on all charges before announcing a verdict on any.

guage is in direct conflict with the claim that the jury had reached a final, unanimous decision to acquit on the first degree murder charge. The last note is of the same nature and indicated that the jury still had not come "to an agreement." This language, again, is inconsistent with the claim that the jury had reached a final, unanimous decision to acquit on the first degree murder charge.

These notes, particularly the one submitted on the day the vote for acquittal was reportedly taken, strongly suggest that at the time the jury as a whole was communicating with the court through the foreperson's notes, the jury understood that the vote for acquittal on the first degree murder charge was not a final, unanimous vote. Indeed, the instructions of the court informed the jurors that their internal votes were not the final verdict. Under these circumstances, not only do the foreperson's representations after discharge not meet the plain standards for a verdict set out in Rule 31, they also do not meet the test articulated in *Lewis v. United States, supra,* 466 A.2d at 1238—that a verdict be "certain, unqualified and unambiguous." Thus, for that additional reason, the court must deny defendant's request to enter a not guilty verdict on the first degree murder charge.

### RECALLING THE JURY

■ Without separately polling each of the twelve jurors to determine if the vote reported by the foreperson was intended to be final, the court could not know that the foreperson's perceptions as reported after discharge were indeed accurate.[5] Although defendant has not requested that the court recall the jurors, the court has nonetheless examined the question of whether it should do so in order to determine if they had reached a final, unanimous decision to acquit defendant on the first degree murder charge. The court concludes that neither legal principles nor sound policy would support recalling the

jury for such an inquiry after it has been discharged and dispersed.

■ In this case, the jury announced on three occasions during its five days of deliberations that it was deadlocked and was discharged for that reason. Once a jury has been discharged, it cannot impeach its deadlock, any more than it can impeach its own verdict. *United States v. MacQueen,* 596 F.2d 76, 83 (2d Cir.1979); *McKay v. Raines,* 405 F.Supp. 363, 365 (D.Kan.1975); *See also Sellars v. United States,* 401 A.2d 974, 980–82 (D.C.1979). At first glance, the policy denying a jury the opportunity to impeach a deadlock and giving it a second chance to acquit on a serious charge is disquieting. The reasons behind it, however, have long-standing acceptance, frequently articulated in the context of impeaching a verdict rather than a deadlock.

As explained in *Sellars,* the prohibition on impeaching a verdict, equally applicable to impeaching a deadlock, is justified by the need to discourage harassment of jurors after discharge, to encourage free and open discussion among jurors in the jury-room, to reduce incentives for jury tampering, to promote finality, and to maintain the viability of the jury as a judicial decision-making body. *See Sellars v. United States, supra,* 401 A.2d at 981; *See also McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). Thus, in *Sellars,* a jury was not permitted to impeach a verdict of guilty on a manslaughter charge even though individual jurors later indicated that they had misunderstood the instructions and did not mean to find the defendant guilty of that charge. *Sellars v. United States, supra,* [401 A.2d at 982]. Recall of the jurors in this case would run directly counter to policies behind impeaching deadlocks, as well as verdicts. *See also Queen v. District of Columbia Transit Sys. Inc.,* 364 A.2d 145, 148 (D.C.1976) (remarking that it would have been "better practice" for the judge to refuse to hear from a juror after the verdict was announced).

---

5. The court does not mean to impugn in any way the veracity of the foreperson, who the court does not doubt reported the situation as

she understood it when making her final representations to the court.

Moreover, once jurors have dispersed, they are no longer free of outside influences on their decisions. In this case, the court informed the jurors that after discharge, they were free to talk about the case with anyone they chose. Many took the opportunity immediately after discharge to speak with both counsel, who apparently disclosed information that had not come out at trial. It is fair to assume that those jurors and others may have talked with friends and relatives about the case shortly after discharge. Thus, no untarnished verdict could be rendered now, nor could it have been by the time this matter was brought to the court's attention following the luncheon recess.

■ While a poll of the jury immediately after return of a verdict or immediately after a note of deadlock is a commonly accepted procedure, a poll comes too late after the jury has dispersed. *See Whiteaker v. State*, 808 P.2d 270, 278 n. 12 (Alaska Ct.App.1991); III ABA Standards for Criminal Justice § 15–4.5 at 147–48 (2d ed. 1986 Supp.). As the court so cogently articulated it in *Fitzgerald v. Lile*, 732 F.Supp. 784, 789 (N.D.Ohio), *aff'd* 918 F.2d 178 (6th Cir. 1990):

> To adopt a rule which would allow post-discharge revelations from some or all of the jurors about the state of their deliberations with respect to the stated charge and the lesser offenses would create endless confusion and controversy where a mistrial has been declared after [the] jury has announced that it is unable to agree. For good and sound reasons uniformly accepted, a jury ceases to exist as an instrumentality of the justice system once it has been discharged.

This court adopts the reasoning of *Fitzgerald* in declining to take steps to impeach

the deadlock announced on three occasions by the jury in this case.

## SUA SPONTE INSTRUCTIONAL OBLIGATION

■ Apart from requesting the court to enter a verdict of acquittal on the first degree murder charge, defendant independently contends that even though defense counsel never asked for it and the jury never indicated a need for further guidance on this issue, the court had an obligation to *sua sponte* instruct the jury on its right to return a partial verdict and to inquire if it had returned a partial verdict before granting defendant's motion for a mistrial.[6] Defendant contends that the court's failure to give such an instruction or make such an inquiry constituted plain error.[7] This plain error, defendant contends, violated his right not to be put twice in jeopardy for the same charge. Accordingly, defendant argues, he cannot be retried on the charge of first degree murder.

In analyzing the issue of whether the court had a *sua sponte* instructional obligation, the court must put aside the information provided by the foreperson. *See United States v. MacQueen, supra,* 596 F.2d at 83 (holding that "statements [of jurors offered to impeach an announced deadlock] cannot be considered by the court"). *See also Fitzgerald v. Lile, supra,* 732 F.Supp. at 789; *McKay v. Raines, supra,* 405 F.Supp. at 365; *Whiteaker v. State, supra,* 808 P.2d at 273 n. 4; *State v. Castrillo,* 90 N.M. 608, 610, 566 P.2d 1146, 1148 (1977). Therefore, the factual posture in which this issue must be decided is dictated by the events prior to discharge, specifically, the jury's announcement on three separate occasions that it was unable to reach an agreement. The issue then, is a narrow one: whether the trial court, in the

---

6. Super.Ct.Crim.R. 31(b) provides:

   If there are 2 or more defendants or if there are 2 or more counts, the jury at any time during its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed or with respect to a count or counts as to which it has agreed; if the jury cannot agree with respect to all, the defendant or defendants as to whom it does not agree or the count or counts

as to which it does not agree may be tried again.

7. Plain error "must be so clearly prejudicial to the [defendant's] substantial rights as to jeopardize the very fairness and integrity of the trial." *Stewart v. United States,* 490 A.2d 619, 625 (D.C.1985); *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

absence of a request, is required *sua sponte* to instruct the jury on its right to return a partial verdict when the only facts the court has within its knowledge are the repeated statements of the jury that it is unable to agree.

Furthermore, in analyzing this issue, the court has concluded that if there is a *per se* requirement for the court to *sua sponte* give a partial verdict instruction, all the other counts, as well as the lesser included offense of second degree murder, would appear to be equally implicated. This is because there is no meaningful distinction—in the absence of the prohibited information about the internal deliberations of the jury—between the potential effect caused by this purported error on the first and second degree murder charges and on the other charges against defendant. *See Whiteaker v. State, supra,* 808 P.2d at 274. The absence of the partial verdict instruction and an inquiry about the possibility of a partial verdict would potentially affect all of the charges against him, as well as the lesser included offense.

The issue of whether, in the absence of a request, the court is obligated to instruct on or inquire about a partial verdict has been considered by a number of courts. Contrary to defendant's assertion, the overwhelming weight of authority is that there is no such obligation. *See United States v. MacQueen, supra,* 596 F.2d at 82 (stating "[n]or should we adopt a *per se* rule that a mistrial is improperly declared whenever the trial judge fails to specifically inquire as to the possibility of a partial verdict"); *United States v. Dakins,* 277 U.S.App.D.C. 91, 94, 872 F.2d 1061, 1064 (instructing that "[i]ndeed, it is not even required that the jury be instructed about its right to return a partial verdict at all"), *cert. denied,* [493 U.S. 966, 110 S.Ct. 410, 107 L.Ed.2d 375] (1989); *United States v. DiLapi,* 651 F.2d 140, 147 (2d Cir.1981) (noting that "the absence of such an explanation [by the trial court with respect to the right to return a partial verdict] did not deny the appellants any protected right in a case such as this where the jury neither attempted to return a partial verdict nor even asked if it could do so"), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). *See also United States v. Wheeler,* 802 F.2d 778, 781 (5th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987).

This conclusion was reached in the case of *Fitzgerald v. Lile,* 732 F.Supp. 784 (N.D.Ohio), *aff'd,* 918 F.2d 178 (6th Cir. 1990) on facts remarkably similar to the ones in this case. There, the jury was instructed on the charge of aggravated vehicular homicide and the lesser included offense of vehicular homicide. After the foreperson indicated on two occasions that there was no possibility of reaching a verdict, the judge declared a mistrial. *Id.* at 785. The defendant had neither moved for nor objected to the mistrial. After the jury was discharged, a completed jury form signed by all twelve jurors and finding the petitioner "not guilty" on the aggravated vehicular homicide charge was discovered in the juryroom. At a post-trial hearing, the foreperson testified that the jury had quickly found defendant not guilty on the greater charge and spent the remaining time debating the lesser charge. *Id.* Defendant contended that the Double Jeopardy Clause prevented his retrial on the aggravated vehicular homicide charge. *Id.* at 786.

As a starting point, the court in *Fitzgerald,* as here, found that it must not consider the later-found verdict form nor the testimony of the foreperson, but must only consider the pre-discharge knowledge of the trial judge. *Id.* at 789. It noted further that, as here, no jury question had revealed any need to inquire of the jury about whether it had reached a verdict on the greater offense. The court held that the Double Jeopardy Clause does not impose a *sua sponte* obligation on the court to inquire about whether a jury has reached a partial verdict on a greater charge where there is no suggestion that the jury may have reached a partial verdict. *Id.*

Another case reaching essentially the same conclusion is *Whiteaker v. State,* 808 P.2d 270 (Alaska Ct.App.1991), which defendant contends supports his argument that the court had a *sua sponte* obligation

to instruct on and inquire about a partial verdict. In that case, involving a first degree murder charge and lesser included offenses, the jury announced it was deadlocked. Defense counsel requested that the judge inquire about a partial verdict before discharging the jury, particularly noting that the jury might have found an acquittal on first degree murder. The court refused to make the inquiry. *Id.* at 272. After the judge had discharged the jury and while all jurors were still in the courtroom as a body, a member of the jury asked whether it was possible to be hung on one charge and not another. The court again refused counsel's request to inquire about a partial verdict and discharged the jury. *Id.* at 273.

On appeal, the court held that if defense counsel had not made the request for the inquiry, the record would support a finding of no probability that a verdict could be reached—hence, justifying a mistrial without an inquiry about the possibility of a partial verdict. *Id.* at 277. The court stated specifically, "[W]e decline to place a burden on the trial judge to *sua sponte* inquire further or perform a special poll of jurors who deliberate on cases involving lesser included offenses." *Id.* That statement is directly contrary to defendant's claim that *Whiteaker* supports a *sua sponte* obligation of the trial court to instruct or inquire about a partial verdict.

The court in *Whiteaker*, however, went on to hold that ["]upon evidence of confusion among the jurors, a different rule must apply.["] *Id.* Given the particular circumstances of that case, in which before the jury dispersed, a juror made an inquiry which suggested the possibility of a partial verdict and defense counsel specifically requested that an inquiry be made, the court found that the trial judge abused his discre-

tion in declaring a mistrial over the objection of counsel.[8] *Id.* at 278.

The one decision cited by defendant which legitimately appears to support his claim that a *sua sponte* instructional obligation exists is *State v. Castrillo*, 90 N.M. 608, 566 P.2d 1146 (1977). There, the court overruled a prior decision of that jurisdiction and held that in the future, when a jury announces its inability to reach a verdict in cases involving lesser included offenses, the trial court will be required to inquire of the jury whether it has unanimously voted for acquittal on any of the offenses on which the jury had been instructed. *Id.* at 611, 566 P.2d at 1149.

The *Castrillo* decision, however, did not make clear its exact rationale for imposing that requirement. One issue addressed by the court was whether a court should ever be permitted to ask about a possible verdict on the main charge or any lesser included charge before the jury has resolved the entire package. The court answered that question in the affirmative. *Id.* at 611–12, 566 P.2d at 1149–50. The other issue was whether there could ever be "manifest necessity" to declare a mistrial without the consent of the defendant within the meaning of the Double Jeopardy Clause, as discussed *infra* at 954, until such an inquiry had been made. The court held that such manifest necessity could not be found. *Id.* at 613–14, 566 P.2d at 1151–52. Neither of those holdings, however, lead inexorably to the conclusion in *Castrillo* that the inquiry must be made in every case regardless of a request from any party and regardless of any indication from the jury that such a verdict may have been reached.

The court in *Fitzgerald* suggested that the real reason behind the decision in *Castrillo* was that the appellate court did not follow its own reading of the law and,

---

**8.** Another major issue which the court in *Whiteaker* faced as a preliminary matter was whether an accused is entitled to a verdict on the greater charge where the jury has unanimously decided the charge but is deadlocked on the lesser included offenses. *See Whiteaker, supra,* 808 P.2d at 274. The court concluded that the accused is entitled to such a verdict. *Id.* That issue, of whether the defendant would be enti-

tled to a verdict on the greater charge, is not present in this case. In fact, although the court is unaware of any decision in this jurisdiction specifically addressing that question, the court reads the decision in *Jones v. United States*, 544 A.2d 1250 (D.C.1988), as suggesting, by implication, that a defendant would be entitled to such a verdict.

instead, took into account the deposition testimony from the jury foreman offered in support of the defendant's allegation that the jury had acquitted defendant of the first and second degree murder charges. *Fitzgerald v. Lile, supra,* 732 F.Supp. at 788 n. 4. The *Fitzgerald* court noted that it "seriously doubted" whether *Castrillo* would have reached the same result if confronted with a case where there was no evidence to show that the jurors had voted to acquit on one of the greater offenses. *Id.*

The *sua sponte* requirement imposed on judges by *Castrillo* appears contrary not only to the weight of precedent but also to a number of sound policies. First, in a general sense, *sua sponte* instructional obligations run counter to the traditional rule imposing on counsel the obligation to request instructions or to object to actions taken at trial. Moreover, they provide counsel with an incentive to stand silent and sow error in the record, destroying the incentive to object and have the matter resolved during trial. *See Johnson v. United States,* 387 A.2d 1084, 1089 (D.C. 1978) (en banc).

More specifically, in this context such a *sua sponte* obligation threatens to disrupt the fine line which a trial judge must tread with respect to partial verdicts. Particularly where the jury has given no indication of agreement on any charge, a judge must be careful not to coerce juries into reaching decisions. *See United States v. Wheeler, supra,* 802 F.2d at 781; *United States v. DiLapi, supra,* 651 F.2d at 147.[9] In this case, after three notes clearly indicating that the jury could not agree during the

course of five days of deliberations, an instruction and inquiry on a partial verdict could easily have had that effect. The jury could conclude that the best way to escape what had apparently become a frustrating and unpleasant process would be to reach a compromise on some charge.[10]

Most importantly, however, is that such a *per se* rule is inconsistent with the tactical judgments which defendants make at trial. The strength of the evidence, the configuration of the charges, and the defense's assessment of its chances with a particular jury are all factors which can influence a decision on whether the defense wishes to inquire into the possibility of a partial verdict. A *per se* rule requiring instruction and inquiry about a partial verdict in every case as a prerequisite to a mistrial would overlook the tactical decisions which the defense must make when a jury announces a deadlock, particularly since the essence of a deadlock is that some unspecified number of jurors favor conviction of the defendant on at least one charge. The defense may fear that the partial verdict which is returned may not be a favorable one. Further, even if favorable, the defense may not wish to have a less serious charge resolved—whatever the outcome—and be forced to face a second jury with only the most serious charge alone, where the jury's only choice would be to convict or acquit. For example, in *Towles v. United States,* 521 A.2d 651, 655–56 (D.C.), *cert. denied,* 483 U.S. 1008, 107 S.Ct. 3236, 97 L.Ed.2d 741 (1987), the Court of Appeals found that defendant had waived his Double Jeopardy claim on a second degree murder charge by making a tactical decision not to raise a Double Jeop-

---

9. The concern of the Court of Appeals that instructions from the trial court given to a deadlocked jury should not coerce it into a verdict is well established. *See Epperson v. United States,* 495 A.2d 1170, 1174, 1176 (D.C.1985); *Thompson v. United States,* 354 A.2d 848, 850–51 (D.C. 1976); *Winters v. United States,* 317 A.2d 530, 532 (D.C.1974).

10. The court notes that the partial verdict instruction, given too early, can cause difficulties also. Clearly, the hope and the assumption (borne out in the vast majority of cases) is that the jury will resolve all charges, thus obviating

the need to spend the time and resources retrying any of them. The partial verdict instruction somewhat undermines that goal. It also encourages jurors to reach quick verdicts on charges before all the facts have been thoroughly discussed, thus raising the spectre that before discharge, some jurors will wish to change their minds, but be precluded from doing so on the verdict already announced and recorded. *See, e.g., United States v. Dakins,* 277 U.S.App.D.C. 91, 94–95, 872 F.2d 1061, 1064–65, *cert. denied,* [493 U.S. 966, 110 S.Ct. 410, 107 L.Ed.2d 375] (1989).

ardy objection to a lesser included offense instruction on second degree murder in order to give the jury an option other than convicting or acquitting him on the first degree murder charge alone.

Indeed, the tactical judgments with respect to the partial verdict instruction or inquiry are similar to the tactical judgments recognized in *Wright v. United States*, 588 A.2d 260 (D.C.1991). There, the court held that where there is a lesser included offense, the defense can choose whether to request an "acquittal first" instruction (where the jury must find the defendant not guilty of the greater charge before considering the lesser charge) or a "reasonable efforts" instruction (where the jury is permitted to consider the lesser included charge after making reasonable efforts to reach a decision on the greater charge). *Id.* at 261–62. In giving this choice to the defendant, the court explained that either instruction may have advantages and disadvantages depending on the views of the majority of the jury and can cause jurors to capitulate and convict on the greater charge or to compromise and convict on the lesser. *See also Jones v. United States*, 544 A.2d 1250 (D.C.1988); *United States v. Tsanas*, 572 F.2d 340 (2d Cir.), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978).[11]

▉▉▉ Given the tactical nature of the judgment to be made by the defense in determining whether to request a partial verdict instruction or inquiry, a *per se* rule requiring the court *sua sponte* to give such an instruction would be inappropriate. Moreover, as the tactical judgments illustrate, a partial verdict instruction or inquiry is as likely to produce a guilty verdict as a not guilty verdict. Under those circumstances, the failure to *sua sponte* give the instruction or make the inquiry cannot meet the plain error standard of clearly prejudicing the substantial rights of the

defendant. *See Stewart v. United States, supra*, 490 A.2d at 625.

Thus, substantial case law as well as sound policy stand contrary to defendant's claim that the court committed plain error by not *sua sponte* instructing the jury on partial verdicts or inquiring whether one had been reached despite the absence of any indication from the jury that it had reached a partial verdict and despite any request for such an instruction from defendant. Under those circumstances, the court cannot conclude that it committed plain error by not instructing and inquiring in the manner which defendant now contends was required. Accordingly, the court cannot find that a Double Jeopardy bar precludes his retrial on the first degree murder charge.

## WAIVER OF DOUBLE JEOPARDY CLAIM

▉▉▉ Recognizing that, in any event, he might have waived any claim of protection against Double Jeopardy by moving for a mistrial, defendant argues that no such waiver occurred because he could not know what the jury was thinking and thus lacked control over the decision. The issue of whether defendant had control over the decision to move for a mistrial, however, no longer appears to be the standard for whether Double Jeopardy bars a retrial. Rather, the issue appears to be whether defendant was intentionally goaded by the court or the prosecutor into moving for the mistrial. Under either standard, however, by moving for a mistrial in the context of this case, defendant gave up his right to assert a claim of Double Jeopardy completely apart from whether or not the court erred by not instructing or inquiring about the possibility of a partial verdict.

▉▉▉ The Double Jeopardy Clause of the Fifth Amendment[12] not only ensures the finality of criminal judgments and pro-

---

11. The court notes that the problem here—that the jury may have meant to acquit defendant on first degree murder—would not have been cured had defense counsel requested the reasonable efforts instruction, since the defendant's

claim is that the jury was deadlocked on the lesser charge of second degree murder.

12. "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend V.

tects against multiple punishments for the same offense, but also safeguards a defendant's obvious interest in avoiding the burdens of a second prosecution when his first trial was unnecessarily aborted before judgment. *See Douglas v. United States,* 488 A.2d 121, 129–30 (D.C.1985) (citing *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)). Jeopardy attaches as soon as the jury is empaneled and sworn. *See United States v. Martin Linen Supply Co.,* 430 U.S. 564, 569, 97 S.Ct. 1349, 1353, 51 L.Ed.2d 642 (1977); *Douglas v. United States, supra,* 488 A.2d at 130. Once jeopardy attaches, the defendant gains the valuable right to have the trial completed by a particular tribunal. *Douglas v. United States, supra,* 488 A.2d at 130 (citations omitted).

■ The right to avoid retrial on the same charges, however, is not absolute. Where, as here, a mistrial is declared, the critical initial inquiry must be whether the defendant requested or consented to the mistrial. If defendant neither requested or consented to the mistrial, then a retrial is barred unless the mistrial was justified by "manifest necessity." *See, e.g., United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824) (holding that a jury's inability to reach a verdict constitutes a "manifest necessity" for a mistrial). *See also Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984), (stating "[A] trial court's declaration of a mistrial following a hung jury is

not an event that terminates the original jeopardy to which petitioner was subjected").

■ Where the defendant moves for a mistrial, however, the standard is much lower. A defendant's motion for a mistrial is ordinarily deemed to remove any barrier to reprosecution, even if necessitated by prosecutorial or judicial error. *See United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 197 (1978); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 5, 27 L.Ed.2d 543 (1971).[13]

In *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court directly confronted the issue of what standard should be applied to determine when Double Jeopardy bars a retrial if the defendant, as here, has moved for the mistrial. The Court in *Kennedy* recognized that there should not be a flat rule precluding a defendant from obtaining protection against Double Jeopardy whenever the defendant has moved for a mistrial. *Id.* at 679, 102 S.Ct. at 20. The Court held, however, that the circumstances where Double Jeopardy principles bar a retrial after a defendant has moved for a mistrial are extraordinarily narrow. Those circumstances are "limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to pro-

---

**13.** It is this distinction between the standard of "manifest necessity" when a mistrial is declared over the defendant's objection and the much lower standard when defendant has requested a mistrial which distinguishes two other cases relied upon by defendant to support his claim that the court had a *sua sponte* obligation to instruct and inquire about a partial verdict. The first case, *State v. Pugliese,* 120 N.H. 728, 422 A.2d 1319 (1980) involved the issue of whether there was a manifest necessity for the trial court to grant a mistrial over defendant's objection when the trial court refused defendant's request to inquire of a deadlocked jury whether it had reached a partial verdict. The appellate court held that there was no necessity to declare a mistrial before making the inquiry requested, and thus that the Double Jeopardy Clause barred a retrial on the pertinent charge. *Id.* at 732, 422 A.2d at 1321.

In the second case, *Stone v. Superior Court,* 31 Cal.3d 503, 183 Cal.Rptr. 647, 646 P.2d 809 (1982), the jury foreman twice announced that the jury had no votes for conviction on first or second degree murder, but was divided between three other lesser included offenses. The trial court believed itself precluded from accepting the verdicts of acquittal on the greater charges until verdicts were reached on the lesser charges. On appeal, the California Supreme Court held that when a jury clearly favors acquittal on the greater charge, but is unable to agree on a lesser included charge, the Double Jeopardy Clause requires a court to receive a partial verdict and no manifest necessity would exist if the court granted a mistrial over objection without taking such a verdict. *Id.* at 519–20, 183 Cal.Rptr. at 658, 646 P.2d at 820.

voke the defendant into moving for a mistrial." *Id.*

In the present case, there is no question that neither the judge nor the prosecutor took any action "intended to provoke the defendant into moving for a mistrial." *Id.* Indeed, the court asked to hear from both counsel on that issue and the prosecutor deferred to defense counsel. Rather, it was the three notes from the jury announcing their inability to reach a decision which presumably caused the defendant to move for the mistrial. Thus, under the *Kennedy* standard, defendant gave up his right to avoid a retrial by moving for the mistrial. Moreover, that would be true even if the court had erred by not *sua sponte* instructing on or inquiring about a partial verdict, since the *Kennedy* standard assumes that judicial or prosecutorial error may have been committed.

Without addressing the standard set down in *Kennedy*, defendant relies on reasoning from *United States v. Dinitz*, 424 U.S. 600, 606–07, 96 S.Ct. 1075, 1078–80, 47 L.Ed.2d 267 (1976) to support his Double Jeopardy claim. In *Dinitz*, where defendant had moved for a mistrial after the trial court had banished the lead counsel from the courtroom, defendant claimed that this motion for a mistrial had not constituted a waiver of his Double Jeopardy rights because he had no realistic choice but to seek a mistrial. *Id.* at 605, 96 S.Ct. at 1078. This argument was accepted by the Oregon Court of Appeals. The Supreme Court reversed, holding that "traditional waiver concepts have little relevance where the defendant must determine whether or not to request or consent to a mistrial in response to judicial or prosecutorial error." *Id.* at 609, 96 S.Ct. at 1080. As the court noted, the defense faces a "Hobson's choice" under such circumstances. The important consideration for Double Jeopardy purposes "is that the defendant retain primary control over the course to be followed in the event of such error." *Id.; United States v. Scott, supra,* 437 U.S. at 93–94, 98 S.Ct. at 2194–96.

Defendant argues that when he moved for a mistrial in this case, he did not retain primary control over the course to be followed because he did not know of the partial verdict purportedly reached by the jury. Moreover, there was no opportunity for the defendant to discuss those options with his counsel in an informed manner. It is on this basis that defendant attempts to distinguish *Dinitz*, the reasoning of which he relies upon in arguing that he did not give up his Double Jeopardy claim by moving for a mistrial.

In light of *Kennedy*, it is not certain that the standard set down in *Dinitz* is still good law. In any event, what is apparent is that defendant, despite his disclaimer, is really attempting to argue that he did not make a knowing, intelligent, and voluntary waiver of his Double Jeopardy rights, applying the standard set down in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In other words, defendant is claiming that he did not know of the purported acquittal, and thus could not intelligently and voluntarily waive it after discussing this with counsel.

*Dinitz*, however, specifically addressed the applicability of the knowing, intelligent, and voluntary waiver standard in the Double Jeopardy context. There, the respondent had argued that to be valid, a defendant's motion for a mistrial must meet that standard. The Supreme Court stated, "This Court has implicitly rejected the contention that the permissibility of a retrial following a mistrial ... depends on a knowing, voluntary, and intelligent waiver of a constitutional right." *United States v. Dinitz, supra,* 424 U.S. at 609–10 n. 11, 96 S.Ct. at 1080–81 n. 11. Thus, defendant's argument in this respect must fail.

Moreover, the court notes that, contrary to his claim, defendant did retain primary control over the course to be followed at the time he moved for the mistrial. Although the court opined, upon receipt of the final note from the foreperson, that it appeared the jury would have to be discharged, it took no action to that end *sua sponte*. Instead, the court sought out the position of both counsel, and the prosecutor deferred to defense counsel. Defense counsel at that moment retained control, in

that he had the ability to request that the court instruct or inquire as to a partial verdict, request a poll of each juror individually to determine if the jury was in fact deadlocked, or request that the jury be asked to deliberate further. Under these circumstances, the Double Jeopardy Clause does not preclude a retrial on the first degree murder charge.

### CONCLUSION

Accordingly, is this 19th day of December, 1991,

ORDERED, that the defendant's motion for an order barring his retrial on the charge of first degree murder while armed or, alternatively, accepting the not guilty jury verdict on the first degree murder charge is DENIED.

/s/Noel Anketell Kramer
NOEL ANKETELL KRAMER
JUDGE
SIGNED IN CHAMBERS