Katherine Louise **BAILEY**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 93–CO–1619.

District of Columbia Court of Appeals.

Argued Oct. 23, 1995.
Decided May 23, 1996.

---

Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, and Stephen J. Pfleger, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and REID, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

Appellant Katherine Louise Bailey, charged by information with simple assault (D.C.Code § 22–504) and related offenses, seeks review in this court of an order of the trial court denying her motion to dismiss the information. She argues that, because a prior trial was not terminated for "manifest necessity," the bar against double jeopardy required dismissal. We agree.

 In the interest of brevity, as well as defining the precise issue here in relation to the facts, some discussion as to conceptions and misconceptions regarding double jeopardy is warranted. At the very minimum, to the layperson at least, the development of law as to the age-old concept of "double jeopardy," (embodied in the Fifth Amendment of our Constitution (*see Douglas v. United States,* 488 A.2d 121 (D.C.1985))), must appear to be oblique. In a jury trial the prohibition against a retrial for the same offense attaches as soon as the jury is empaneled and sworn. For several basic reasons, therefore, once this protection attaches at a first trial, a mistrial declared without the consent of a defendant makes any attempt to begin a second prosecution vulnerable to dismissal under the double jeopardy clause of the Fifth Amendment. *Id.* at 130–31. Yet, this rule is not a rule at all (in the sense that it can be applied mechanically). *Id.* at 131 (citing *United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 554–55, 27 L.Ed.2d 543 (1971)). When, at a first trial "courtroom errors or *other developments* . . . make a just judgment *impossible,* the public's interest in maintaining the integrity of the criminal justice system will outweigh the defendant's right to obtain a judgment, and the court may terminate the trial without the defendant's consent and without foreclosing reprosecution." *Id.* (emphasis added). Before making this *drastic* decision to declare a

Daniel J. Harn, Washington, DC, appointed by the court, for appellant.

S. Elizabeth Poteat, Assistant United States Attorney, with whom Eric H. Holder,

mistrial, the first trial judge must determine (1) whether there is *manifest necessity* to discharge the jury, and (2) whether there is an alternative measure—less drastic than a mistrial—that can cure the problem arising as a result of the developments at trial. *Id.* at 131–33.[1] A hapless trial judge, therefore, faced with events which raise the specter of mistrial, may be in the unenviable position of deciding whether it will opt for reversal on appeal should it permit the case, over defense objection, to go to a possible conviction, or reversal on appeal when, confronted in the same case with a second prosecution, it refuses to dismiss the second prosecution. The conscientious trial court in the instant case, however, may find some comfort in the fact that the reversal as to the second option is not so much attributable to its error in granting a mistrial the first time around as it is to the failure of the government, in attempting to pursue a second prosecution, after a mistrial was granted over defense objection, to meet its *heavy* burden of showing that the mistrial was justified. *See id.* at 133. As a reviewing court, on this record, and "resolv[ing] any doubt 'in favor of the liberty of the citizen,' " we find that a retrial is barred (*id.* (citations omitted)), and we order the dismissal of the information.

## I.

### The Attachment of Jeopardy

On the instant record there is no question that, when Ms. Bailey went to trial on August 11, 1993, before a jury sworn on August 12th, jeopardy attached. It was after the complaining witness had testified (on August 12, 1993), that Ms. Bailey had acted erratically on the day of the alleged assault (January 24, 1993), that events took place which led to the aborted trial.[2]

### The Trial Developments Triggering Mistrial

After a luncheon break, defense counsel approached the bench, and the trial court asked the jurors to return to the jury room. As the jury did so, the court before leaving the bench noted:

> Let the record reflect that the defendant is sitting in her chair with her hand just below her neck and she just breathed through an inhaler a few minutes ago just before the jury came in and we're calling for the nurse.

After a brief recess, the summoned nurse noted for the record her suggestion that Ms. Bailey go to the emergency room for further evaluation and to make sure that nothing was pathologically wrong—a suggestion which the defendant declined. A deputy clerk noted for the record that an emergency technician had been in the courtroom for some time and that the defendant did not wish to go to the emergency room. Defense counsel apprised the court that the paramedics who had come to the courtroom confirmed that the defendant, who had felt she was hyperventilating, had used an inhaler which probably aggravated the breathing condition, but that her blood pressure was within a normal range.

### The Defendant's Opposition to Mistrial and the Court's Conclusion

At this point in the proceedings, there can be no question that defense counsel plainly stated Ms. Bailey's desire to go forward. He suggested how the court could handle the jury in case it had questions:

> My client is anxious to resume her trial. I've told her that I'm worried about any negative inference that the jury might have gotten from seeing my client in what didn't appear to be a [ ] totally conscious state, but she wants to go on with her trial.

> * * * * * *

> I would ask that we go forward and ask that the Court instruct the jury that Ms. Bailey was having difficulty breathing and

---

**1.** Citing Justice Story in *United States v. Perez,* 22 U.S. (9 Wheat) 579, 580, 6 L.Ed. 165 (1824), and *Jorn, supra,* 400 U.S. at 487, 91 S.Ct. at 558.

**2.** There is no question that a month earlier when she appeared before the court for pretrial confer-

ence (July 6) she had tested positive for drugs and was found to be suffering from elevated blood pressure, and that the following day she appeared at the appointed time and was in satisfactory condition.

that she's been examined and that she's all right.

There is likewise no question that the trial court, who had doubt as to whether the jury had observed the defendant's troubling courtroom behavior, but expressing concern as to whether the defendant was really able to participate in her defense, concluded that a mistrial was the only alternative:

I have to say I have great reluctance in continuing with the trial right now given what's just occurred.... I can set this over for August 23rd and we can—the witnesses are still here and [the prosecutor] can advise them to come back on August 23rd. But I think given what's on the record right now and what's happened over the last hour, I don't—I don't think it is advisable to go forward.

\* \* \* \* \* \*

Well, I guess I really I don't care whether it's asthma or whether it's drug related.... I don't think it's appropriate to go forward and I think that there could be serious questions raised later on about whether or not she was really able to participate and whether it was fair to put her through the trial, regardless.

I mean I can understand Ms. Bailey's concern about wanting to get this over with. And undoubtedly if the problem is coming from some anxiety or asthma that she would like to get this over with; isn't that correct, Ms. Bailey?

Ironically, it was the court's inquiry that triggered repeated and unequivocal assurances from the defendant that she wanted to go forward immediately. These assurances were delivered with such intensity that the concern of the court as to competence or serious illness could hardly have been assuaged. Thus Ms. Bailey chatted on:

Because it's been going on and I keep getting myself upset. I mean I keep rushing and keep getting myself upset and that's why I, you know—you know, I—like this morning when I was on my way here, I was rushing. And when I left my house, I had some fish I had fixed and I had ate some fish and I went outside and I had my fish in the sandwich I had this morning on

my way in and everything. I had a little bit soda and everything, but I just want to get the trial over with, so I won't have to keep on—keep on—keep on re—I mean, you know, I want to get mine over with. You know, I don't want to have to keep on—keep on coming back to court, keep on coming back to court. I'm going to keep on getting myself upset because all I'm thinking about is, you know, rushing and I mean you know just keep on—I'm—I'm upset because I'm—I'm nervous and—and everything. And all I want to do is just go ahead—just go ahead—get the—you know, go ahead do what we have to do and get the trial and everything so we can go on, but whether I get—get convicted or whatever, I want to just go ahead cause, you know, go ahead with the hearing and everything, just go ahead so it can be over and done with, Your Honor.

Defense counsel spoke again:

I have no doubt that [my client is] competent to stand trial. She's been able to address my questions. She has severe anxiety and I may have exacerbated the situation right before the case was called because we got into a relatively heated discussion about her case and it could be that aggravated it and that might have cause the hyper-ventilation, but at no time did I have any trouble discussing the case. I thought she understood what I was saying. We simply had a disagreement.

After a brief recess, when the trial court suggested a visit to the emergency room, the defendant spoke again:

[T]his thing been going on ever since last year.

\* \* \* \* \* \*

[W]hen I got arrested, right, I had lost my job, okay? I had lost my job. I had lost my job. I have no income coming in as of now. I can't keep—I mean the longer I keep on hashing on this trial, come—come down here for the Court and everything, I can't even—I can't even go—I had planned on going to college this year. I can't even—I can't even go to college.... I mean if it be two more weeks or whatever, that's still a lot taken out my life. I'll be

35 next year, okay? But I'm trying to go on—on an do some positive things instead of keep on coming down to court. . . .

### The Government's Opposition to Mistrial

Finally, there is no question that government counsel opposed a mistrial. The prosecutor at first suggested that the court engage the defendant in a colloquy to find out "whether she's ready to proceed or not." While the prosecutor said he would of course defer to the court, he added, "It seems to me from what Ms. Bailey seems to be talking about that she's able to converse, she's able to talk with her attorney and go forward. . . ." He finally suggested holding the jury until the next day, "stepping back the defendant overnight and having a medical evaluation done."

The court said it had decided against that course, and ordered the parties to return for evaluation on August 19, followed by trial on August 23rd.

### The Motion to Dismiss

Shortly after the declaration of mistrial, the defendant moved for dismissal of the information. The court received briefs, heard oral arguments, reinforced its reasons for having terminated the trial,[3] and denied the motion to dismiss. Obviously aware that its decision to declare mistrial was reached under unique circumstances where both the defendant and the government had opposed the same, the court *sua sponte* ordered a stay pending appeal.

### II.

Our legal analysis here is straightforward. As we have noted, the prohibition against double jeopardy bars retrial following a mistrial to which the defendant has neither requested nor consented to unless the mistrial was justified by "manifest necessity." *Douglas, supra,* 488 A.2d at 132; *Speaks v. United States,* 617 A.2d 942, 955 (D.C.1992). It is the prosecution that bears the burden of establishing manifest necessity for a mistrial. *Routh v. United States,* 483 A.2d 638, 642 (D.C.1984). Since a mistrial over the objection of the defense is justified "only in very extraordinary and striking circumstances" the prosecution must prove that the development at issue gave rise to a "high degree of necessity" to terminate the trial; even where a high degree of necessity to terminate is established, the prosecution bears the burden of proving that "an alternative measure—less drastic than a mistrial" was unavailable. *Douglas, supra,* 488 A.2d at 132. If either of these factors is not established, a subsequent prosecution must be barred.

The issue here is not solely, as the government proffers, whether the trial court did or did not abuse its discretion in declaring a mistrial based on manifest necessity. The issue is likewise whether the government has met its burden of proving that there was a manifest necessity for a mistrial so as to have preserved its right to bring a second prosecution. It has not done so.

This case illustrates precisely the kind of unique situation that has led America's courts to repeat why a defendant's valued right to have his or her trial completed by a particular tribunal merits constitutional protection and cannot be saddled by mechanical application. See *Arizona v. Washington,* 434 U.S. 497, 503–04, 98 S.Ct. 824, 829–30, 54 L.Ed.2d 717 (1978).[4] A second trial would increase a financial and emotional burden, prolong the period in which the defendant is

---

3. These reasons included the fact that the jury could have remembered that the complaining witness had described the defendant as "crazy" and (therefore, interpreted any medical crisis in that vein), that Ms. Bailey, if convicted, would have attacked the judgment on the grounds that delay was necessary, and that reports subsequent to the mistrial revealed that the defendant was not sober at the time.

4. Mr. Justice Black stated in *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957):

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

stigmatized by an unresolved accusation of wrongdoing, increase further anxiety, and even enhance the risk of conviction. *See id.* at 503–04, 98 S.Ct. at 829–30. Here there was no deadlocked jury, no improper conduct by the defense attorney, and no bad faith on the part of the judge or the prosecutor.

■ There is, moreover, no question here that the defendant did not request or consent to a mistrial. Indeed, her objections to termination were frequent and loquacious. This was not a situation where the trial court was called upon to seriously gauge the effect of possible jury bias; indeed, it is unlikely, on this record, that the jury was aware of the developments which led the court to express concern for the welfare of the defendant. It is also problematical what effect it would have invoked even had the jury been aware of these developments. Moreover, the prosecutor, in suggesting further medical evaluation or an overnight continuance, was obviously not convinced that there was a high degree of necessity for a mistrial and that there were indeed alternative less-drastic remedies (including instruction or inquiry). In deferring nevertheless to the trial court, the government was running the risk of conceding that it had no public interest in maintaining the integrity of the criminal justice system which would outweigh the defendant's requested right to obtain a judgment, and that therefore double jeopardy might attach so as to bar reprosecution.[5] *See Douglas, supra,* 488 A.2d at 131. In this reviewing court, it is hardly in a position to pursue a second prosecution by arguing that the trial court properly granted a mistrial.

We order the dismissal of the information.

*So ordered.*

STEADMAN, Associate Judge, dissenting:

In *Douglas v. United States,* 488 A.2d 121, 133–35 (D.C.1985), we set out at some length the "Scope of Review of Sua Sponte Declaration of a Mistrial." We noted that the decision was committed to the "sound discretion" of the trial court, and that "a reviewing court ordinarily will accept a trial judge's determination that there is a 'high degree of necessity' for a mistrial … as long as that determination is reasonable."[1] More particularly, we there recognized, in substance, that when a mistrial decision is based on factors that are "uniquely within the purview of the trial court," a reviewing court generally should accord "the highest degree of respect" to the trial judge's determination of manifest necessity. I believe that latter principle should be applied here.[2]

The manifest necessity inquiry is highly fact-specific. *See Arizona v. Washington,* 434 U.S. 497, 506 n. 20, 98 S.Ct. 824, 831 n. 20, 54 L.Ed.2d 717 (1978) ("abjures the application of any mechanical formula"); *Illinois v. Somerville,* 410 U.S. 458, 465, 93 S.Ct. 1066, 1071, 35 L.Ed.2d 425 (1973) (each case turns on its facts). Unlike many, perhaps most, double jeopardy situations, here the defendant herself and her present and past conduct, not some adventitious event at trial, were at the very heart of the problem. *Cf. Glover v. United States,* 301 A.2d 219, 222 (D.C.1973) (sua sponte mistrial where appellant was quite ill with withdrawal symptoms); *United States v. Willis,* 647 F.2d 54, 59 (9th Cir.1981) (manifest necessity

---

**5.** Commendably here the government has abandoned the argument, made before the trial court, that the defendant waived her right to make a double jeopardy argument.

**1.** We went on to say: "This is true even when the reviewing court is aware that, if presented with the question in the first instance, other trial judges—or the reviewing court itself—might well be persuaded to continue with the trial." This scope of review was reasserted in, e.g., *Carter v. United States,* 497 A.2d 438, 442–43 (D.C.1985)

**2.** I do not think that what we have characterized as the government's heavy burden to show manifest necessity can be distinguished from the

direct analysis of the trial court's action in granting the mistrial. It is the same inquiry at bottom. Nor do I see any inconsistency between a government position of uncertainty at trial and a vigorous assertion of manifest necessity at the time of the second trial. It is, after all, the action of the trial court that is being reviewed for error. *Cf. Irick v. United States,* 565 A.2d 26, 33 (D.C.1989) ("[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel."). Treating manifest necessity as a showing that the government must make could essentially negate the trial court's ability to declare a mistrial *sua sponte.*

where defendant failed to appear on second day of trial and could not be located). As the majority notes, the events taking place within the courtroom, before the very eyes of the trial court, were such "that the concern of the court as to competence or serious illness could hardly have been assuaged." In addition to competence, concern was also expressed about the effect of appellant's altered behavior on the jury. *See Carter, supra* note 1, 497 A.2d at 441–42 (manifest necessity for mistrial on basis of possible jury taint). Given the totality of the circumstances, I could not from this removed appellate vantage point set aside the trial court's first hand, on-the-spot and necessarily prompt determination that manifest necessity demanded a mistrial. I respectfully dissent.